# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **vs.** | § | **CRIMINAL NO. 4:18-cr-00115** |
| | § | |
| | § | |
| **RODOLFO "RUDY" DELGADO** | § | |

## THE UNITED STATES' RESPONSE TO DEFENDANT'S
## AMENDED MOTION FOR CHANGE OF VENUE FOR TRIAL PURPOSES ONLY

The United States of America, by and through the United States Attorney, Ryan K. Patrick and Assistant United States Attorney Robert Guerra for the Southern District of Texas, and Department of Justice, Public Integrity Section Trial Attorney Peter Nothstein, and hereby submits its Response to Defendant's Amended Motion for Change of Venue for Trial Purposes Only, Dkt. 59 ("Mot.").

## I.   Introduction

The defendant has no right to an intradistrict transfer of this properly venued case.   The discretionary factors for this court to consider in deciding whether to grant the intradistrict transfer do not weigh in favor of such a transfer.

First, this case was investigated and charged in the Houston Division for proper law enforcement reasons.  Among those reasons are that defendant is a well-known public official in the relatively small McAllen area community and active candidate for judicial office.  The government anticipated that this case would garner significant media attention in the McAllen Division, and it has.  This coverage, coupled with the defendant's profile in the community and

status as an active candidate for judicial office, suggest that picking a jury without prior knowledge of the defendant or his charges will be challenging, if not impossible.

Second, the distance between McAllen and Houston does not present significant inconvenience for the defendant.  Since the defendant was charged in February 2018, he has engaged in significant voluntary travel to cities as far or nearly as far from McAllen as Houston. Furthermore, the defendant overstates of the difficulty of travel between McAllen and Houston—two cities linked by several daily relatively low-cost 75-minute direct flights.

Finally, the defendant asserts that he will present several witnesses who live in McAllen, but the defendant has no obligation to actually call any witnesses.  Even if the defendant ultimately chooses to put on a defense, the testimony of many of his anticipated witnesses is subject to challenge and may be inadmissible.  Therefore, this court should hold a hearing on the need for these witnesses and require an offer of proof as to what admissible evidence the witnesses will provide.

For these reasons, discussed more fully herein, this court should deny the motion for intradistrict transfer.

## II.    Relevant Factual Background

### A.  This Investigation was Conducted from Houston to Preserve Secrecy and Charged in Houston to Avoid Pretrial Publicity.

The government began an investigation involving the defendant, Rodolfo "Rudy" Delgado, then the presiding 93rd Texas State District Judge, in late 2016.  The defendant is a prominent member of the relatively small McAllen community, located in Hidalgo County. Over the 18 years he has served as the District Judge for the 93rd district, he has presided over thousands of cases involving the people of the McAllen area, and has campaigned for re-election

every four years.  Even now, he is an active candidate for the 13th Circuit Court of Appeals, which covers the McAllen area and twenty surrounding counties.

In order to protect the secrecy of the investigation, all investigative techniques that have required the issuance of a subpoena or court order have been issued through the Houston office of the U.S. Attorney's Office or by a judge sitting in the Houston Division of the Southern District of Texas.  For example, all pen registers, search warrants, tracking warrants, and other court orders were signed by judges in the Houston Division.

The investigation resulted in the government filing a criminal complaint on February 2, 2018, signed by United States Magistrate Judge Frances H. Stacy in Houston.  The defendant was arrested the same day.  On February 28, 2018, a Houston federal grand jury returned a six-count indictment against Defendant.  The indictment was first superseded on June 19, 2018, also by a federal grand jury sitting in Houston.  The second superseding indictment, also utilizing a Houston grand jury, was returned on July 25, 2018.  In addition, all of the evidence gathered from this case, including the evidence gathered from the search of Delgado's residence and office is stored with the FBI in Houston.

### B.  The Defendant has Engaged in Significant Voluntary Travel Since Being Charged.

Since being charged on February 2, 2018, the defendant has traveled voluntarily and frequently outside of the McAllen area, often traveling distances nearly as great as that between McAllen and Houston.  When the defendant was initially arrested, one of the conditions of his release was to limit his travel to Southern District of Texas.  Dkt. 10.  Since that time, the defendant has filed four motions to travel, all unopposed by the government: February 23 (Dkt. No. 17), March 5 (Dkt. No. 22), May 10 (Dkt. No. 39), and July 19 (Dkt. No. 49).

Although the motions only give insight as to the defendant's connections outside the sizeable Southern District of Texas, they show that the defendant maintains additional regular contacts far from McAllen.  According to the motions, the defendant regularly visits with counsel (apparently retained for purposes unrelated to this case) in Austin, Texas—more than 300 miles from McAllen.  *See* Dkt. 17, 22, 39, 49.  It also appears that the defendant frequently visits his sons, one of whom who lives in Austin, the other in San Antonio (approximately 238 miles from McAllen).  *See* Dkt. 22, 49.  The defendant also visits his doctor in San Antonio. Dkt. 49.   The defendant has requested and received permission from the court to attend the Advance Criminal Seminar and the Advance Family Law Conference, both in San Antonio.  *Id*. These trips suggest that travel from McAllen to cities as far as Houston is not a burden for the defendant.

Furthermore, the defendant obtained a modification of his conditions of release on March 26 (Dkt. 34) allowing him to travel to San Antonio to meet with his counsel in this case without obtaining prior court approval, indicating that the defendant likely travels hundreds of miles to see his attorney more frequently than these four motions suggest.  These trips also indicate that it is not a burden for the defendant to travel great distances as part of his criminal defense.

### C. There is Significant Media Coverage of the Defendant's Charges in the McAllen Division and Essentially No Media Coverage in the Houston Division.

This case has understandably garnered significant media attention in the McAllen Division.  The local newspaper, the Monitor, has followed the case closely, publishing 34 articles related to the defendant from his arrest in February 2018 through the defendant's motion to transfer the case this month.  *See* Exhibit A (list of articles published in the Monitor relating to the defendant's charges).  The effect of the extensive coverage is compounded by the relatively small size of the McAllen Division.  Comprised of Hidalgo and Starr counties, the McAllen

4

Division draws its jury pool from a population of approximately 925,115.[1]  The Monitor is based in McAllen and circulates widely within Hidalgo County, where 93% of the McAllen Division jury pool lives.  *See* Rio Grande Valley Media Network advertising flyer, *available at* http://rgvnetwork.com/advertise/p_d.pdf.

Even prior to the media coverage of the defendant's criminal case, he was already a high-profile individual in the area of Hidalgo County, as one of only two state District Court judges, serving for approximately 18 years.  During that time, he has presided over cases affecting thousands of Hidalgo County residents and has actively campaigned and solicited donations for each of his campaigns.  Moreover, he is now an active candidate for the 13th Circuit Court of Appeals.

By contrast, the Houston division is much larger, drawing its jury from 13 counties with a combined population of over 6.6 million people.[2]  The defendant's case has received almost no coverage in the Houston media. The government was able to find only one article in the Houston Chronicle about the charges, which was published at the time of the defendant's original arrest. *See* Aaron Nelson, FBI alleges judge accepted around $6,000 in bribes in exchange for favorable rulings, Houston Chronicle, Feb. 5, 2018, *available at*

https://www.houstonchronicle.com/news/houston-texas/texas/article/FBI-alleges-judge-accepted-around-6-000-in-12553696.php.

---

[1]      *See* Population Estimates of Texas Counties, 2010-2017, Texas State Library and Archives Commission, available at:  https://www.tsl.texas.gov/ref/abouttx/popcnty2010-11.html.

[2]      The Houston division is comprised of Austin, Brazos, Colorado, Fayette, Fort Bend, Grimes, Harris, Madison, Montgomery, San Jacinto, Walker, Waller, and Wharton counties. http://www.txs.uscourts.gov/offices/houston-division.  The McAllen division is comprised of Hidalgo and Starr counties.  http://www.txs.uscourts.gov/offices/mcallen-division.

III.   <u>**Legal Standard**</u>

      The Constitution provides that "Trials of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const., Article III, § 2, cl. 3.  This right is reiterated in the Sixth Amendment, which provides the right to a "speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed."  U.S. Const., amend VI; *United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir. 1981).

      Once a case is properly venued, it is well established that "[t]here is no constitutional right to be tried in a particular division within a district." [3]  *United States v. McKinney*, 53 F.3d 664, 673 (5th Cir. 1995) (citing *United States v. Anderson*, 328 U.S. 699, 704–05 (1946)); *United States v. Duncan*, 919 F.2d 981, 987 (5th Cir. 1990).  However, Federal Rule of Criminal Procedure 18 provides the court the ability to "set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."  Fed. R. Crim. P. 18.  Rule 18 was amended in 1966, removing the right to an intradistrict transfer.  Prior to that year, "there was a statutory right to trial in the division where the offense was committed. *United States v. Dickie*, 775 F.2d 607, 609 (5th Cir. 1985.  The Advisory Committee Notes to the 1966 Amendment state that the right to an intradistrict transfer "has been eliminated and trial need now be held only "in a district in which the offense was committed." Fed. R. Crim. P. 18.

---

[3]    In his motion, the defendant first cites to a Supreme Court case discussing the important constitutional considerations accompanying the government's selection of venue in a criminal case.  Mot. at 2; *United States v. Johnson*, 323 U.S. 273, 276 (1944).  However, *Johnson* deals not with "the Government's reasons for wanting trial in a certain division or district," but the constitutional question of in which *district*, not division, venue was proper. Mot at 2 (emphasis added); *Johnson*, 323 U.S. at 276.  Similarly, *United States v. Calabres*, cited by the defendant (Mot. at 9), concerned proper venue as between districts in Missouri and Florida.  524 U.S. 1, 4 (1998).  The distinction is significant—the defendant has a constitutional right to a trial in the proper *district* but no constitutional right to a trial in a specific *division*.

In applying Rule 18, "the trial court must balance the statutory factors of the convenience of the defendant and witnesses and the prompt administration of justice." *Dickie*, 775 F.2d at 610. The Fifth Circuit has said that in weighing the convenience factor, the court should consider: (1) the distance from the defendant's home; (2) the location of the defendant's witnesses; and (3) the ability of the defendant's family and friends to attend the trial. *United States v. Garza*, 593 F.3d 385, 390 (5th Cir. 2010). The "prompt administration of justice" factor has been understood to be "in part a literal command that trials comply with the Speedy Trial Act." *Id.* (quoting *United States v. Lipscomb*, 299 F.3d 303, 341 (5th Cir. 2002)).[4]

Courts are not limited to considering only those two factors in deciding whether an intradistrict transfer is warranted. "[A] trial court, in its discretion, may fix the place of trial with regard to factors other than convenience and prompt administration: such factors commonly include, but are not necessarily limited to, docket management, courthouse space and security, and . . . pretrial publicity." *Garza*, 593 F.3d at 341; *see also United States v. Alvarez*, 561 Fed. Appx. 375, 380 (5th Cir. 2014).

To justify an intradistrict transfer, the defendant must make "a strong showing of prejudice." *United States v. Gourley*, 168 F.3d 165, 171 (5th Cir. 1999) (internal quotations omitted); *Duncan,* 919 at 985. The court has broad discretion in determining whether an intradistrict transfer of a case is warranted. *See In re Chesson*, 897 F.2d 156, 159 (5th Cir. 1990); *United States v. Kaufman*, 858 F.2d 994, 1006 (5th Cir. 1988); *Dickie*, 775 F.2d at 609. The Fifth Circuit reviews a district court's denial of defendant's request for an intradistrict transfer for abuse of discretion. *United States v. Roberson*, 124 Fed. Appx. 860, 864 (5th Cir. 2005); *McKinney*, 53 F.3d at 673; *Dickie*, 775 F.2d at 609.

---

[4]     The Fifth Circuit has also stated that factors such as pretrial publicity are part of the prompt administration of justice. *Dickie*, 775 F.2d at 610.

IV.   **Argument**

    A.  **The Discretionary Factors Do Not Favor an Intradistrict Transfer.**

This case is properly venued in the Southern District of Texas—the second superseding indictment alleges that the defendant committed crimes here.  The only question for this court  is whether the defendant is entitled to an intradistrict transfer of this case.  Weighing the discretionary factors, he is not.

    1.   The Distance between McAllen and Houston Does Not Entitle the Defendant to an Intradistrict Transfer.

In claiming that a trial in Houston is inconvenient for the defendant, his family, and witnesses, the defendant relies heavily on the distance between his residence in McAllen and Houston, but the distance alone between the two cities is not dispositive.  The Fifth Circuit has held that a district court's decision to move a trial from Houston to McAllen, "over 300 miles from where the parties and their counsel resided," without more, is "insufficient to reverse the district court's decision to transfer venue."  *Alvarez*, 561 F. App'x at 381.  Moreover, the lack of actual inconvenience of this distance to the defendant is evident in his extensive voluntary intrastate travel since his indictment in February.

The defendant selected trial counsel based in San Antonio, approximately 238 miles from McAllen and approximately 200 miles from Houston.  The selection of an attorney based in neither his home nor the city where he is indicted suggests that proximity is not a paramount concern to the defendant and intrastate travel is not an inconvenience.

Additionally, the defendant's motions requesting to travel show that the defendant frequently travels far from McAllen because of relationships established before the charges in this case, such as his attorneys based in Austin (more than 300 miles from McAllen) and his doctor in San Antonio.  *See* Dkt. 17, 22, 39, 49.  He also visits his sons in Austin and San

Antonio.  *See* Dkt. 22, 49.  To the extent the defendant's sons wish to support him in his trial, they will be traveling, whether the trial is in McAllen or Houston.  The defendant has also requested and received permission from the court to attend the Advance Criminal Seminar and the Advance Family Law Conference, both in San Antonio.  Dkt. 49.  These trips also suggest that travel is not an inconvenience for the defendant.

Furthermore, the defendant's motion overstates the burden that this intrastate travel places on the defendant and others.  There is no dispute that McAllen and Houston are more than 350 miles apart, and that the drive between the two cities may take up to six hours.  However, there are multiple relatively low-cost flights between McAllen and Houston that take approximately 75 minutes.  *See* Exhibit B (list of daily direct flights from McAllen to Houston, each around $425).[5]  The Fifth Circuit has specifically referenced "this age of convenient travel" as a factor militating against the inconvenience of a trial in a division more than 300 miles from where the defendant and his witnesses resided.  *Gourley*, 168 F.3d at 171.  In *Gourley*, the Fifth Circuit held that holding a trial based in Laredo, Texas over the objection of the defendant who resided in Houston—two cities nearly equidistant as McAllen and Houston—was not an abuse of discretion.  *Id*.  The Fifth Circuit noted that the defendant "called many witnesses during the trial," demonstrating that the distance between the two cities presented an inconvenience that was "minimal at best in this age of convenient travel, communication, discovery, and trial testimony preservation."  *Id*. (citing *Smith v. Colonial Penn Ins. Co*., 943 F. Supp. 782, 784 (S.D.

---

[5]      As shown in Exhibit B, the cost of a round-trip ticket from McAllen to Houston is approximately $425, exclusive of taxes, fees, and the cost of travel to and from the airport.  It should also be noted that driving is not a cost-free means of travel.  In addition to gas and tolls, the wear on the vehicle must be considered as well.  The IRS values the use of a person's personal vehicle for professional reasons, such as jury duty or a witness appearance, at 54.5 cents per mile.  IRS Notice 2018-03, *available at* https://www.irs.gov/pub/irs-drop/n-18-03.pdf.  A round-trip drive from McAllen to Houston is approximately 700 miles, resulting in $381.50 in IRS-sanctioned reimbursement, similar in value to the airplane ticket.

Tex. 1996)).  As in *Gourley*, there are many convenient travel options for the defendant, who appears more than willing to voluntarily travel such distances frequently.

The cases cited by the defendant involve cases where the Fifth Circuit has found that distance is one relevant factor in whether to grant intradistrict transfers, but they do not suggest that distance *alone* is a determining factor.  For example, in *Garza*, the Fifth Circuit was most concerned with the delay that resulted from an intradistrict transfer, not the distance between the two cities at issue.  Mot. at 10; *Garza*, 593 F.3d at 389.  In that case, the transfer of the trial from the Del Rio Division to the Waco Division of the Western District of Texas forced the defendant's counsel to withdraw from the case, leading to "substantial delay." *Garza*, 593 F.3d at 389.  In finding that the judge's transfer amounted to an abuse of discretion, the Fifth Circuit considered that the "transfer force[d] the defendant's counsel to try a case far from his or her practice," a factor not present here, as defense counsel is located neither in McAllen nor Houston.[6] *Id.* (citing *Lipscomb*, 299 F.3d at 340).  The court placed great weight on the fact that the transfer caused defense counsel to have to withdraw from the case, noting that "[w]e rarely see a case in which the convenience factor weighs so heavily against transfer." *Garza* at 389.  There is no indication that present counsel will be forced from his representation of the defendant is the case is tried in Houston.

In *United States v. Montemayor*, the Southern District of Texas found, in an unpublished opinion, that trial should be transferred from Houston to Laredo where the defendants lived in Laredo, approximately 350 miles from Houston, the witnesses were from the Laredo area, the pertinent events occurred in Laredo, the evidence was in Laredo, and the defense attorneys,

---

[6]     The defendant avers that "there are several attorneys in McAllen with whom undersigned counsel has worked extensively and who are prepared to provide assistance to undersigned counsel during pretrial preparations and trial" but there are no attorneys other than Mr. McCrum who have entered their appearance in this case.  Mot. at 18.

prosecutors, and law enforcement agents resided in Laredo. *United States v. Montemayor*, No. CRIM. H-13-0039, 2013 WL 4459056, at *2 (S.D. Tex. Aug. 16, 2013). This case differs from *Montemayor* in key respects. <u>First</u>, there is no indication that the defendants in Montemayor voluntarily traveled so frequently to locations as far from Laredo as the defendant does from McAllen—distances the defendant now claims are insurmountable in maintaining his defense. <u>Second</u>, *Montemayor* was a tax case, not public corruption, and there is no indication that there was any pretrial publicity or that the defendants were well-known public figures in the Laredo area. <u>Third</u>, as a tax case, the trial in *Montemayor* appears to have involved a large number of documents located in Laredo. Although there was a significant amount of evidence collected in this investigation, the government's case in chief is expected to be much more limited in scope, consisting of witness testimony, audio and video recordings, and limited documentary evidence. <u>Fourth</u>, two of the three prosecutors are located outside of McAllen, and unlike in *Montemayor*, the defendant has no counsel of record in McAllen. <u>Fifth</u>, the district court in *Montemayor* did not examine less costly and time consuming methods of transportation from Laredo to Houston, so they may not have existed, as they do between McAllen and Houston, as described below. <u>Finally</u>, the court in *Montemayor* rejected the government's request for an evidentiary hearing because it found that the key facts were not in dispute. *Id*. at *4. In contrast, as is demonstrated below, there are substantial questions as to whether the fifteen or more witnesses the defendant intends to call can provide admissible evidence, so there are "critical facts" in dispute that must be resolved at an evidentiary hearing. *Id*.; *see infra* at § IV.A.3.

The defendant also argues that the distance is an inconvenience for his support system, but the defendant fails to cite to a single case where a court found that the convenience to the defendant's support system (as distinguished from the anticipated defense witnesses) was

determinative in whether or not to grant an intradistrict transfer.  The case cited by the defendant

on this point, *Orona-Ibarra* (Mot. at 14), involved constitutional rights at play in selecting proper

venue, and does not stand for the proposition that the location of a defendant's "support system"

is an appropriate factor in an intradistrict transfer.  *United States v. Orona-Ibarra*, 831 F.3d 867

(7th Cir. 2016).  That case dealt with selecting the proper district in which to try a defendant

under the immigration statutes where the defendant was initially arrested in Texas, but was

charged in Illinois.  *Id.* at 872.  Accordingly, that case raised constitutional questions that the

intradistrict transfer sought in this case does not.  Other than the single mention of the "support

system" quoted by the defendant, there is no discussion in that case about the "important value of

a defendant's 'support system' he would lose if not allowed to face trial in the area of his

residence."  Mot. at 14.  Furthermore, there are relatively low-cost and swift means of travel to

Houston available to the defendant's support system in this "this age of convenient travel."

*Gourley*, 168 F.3d at 171.

2.   The Location of the Defendant's Witnesses, if He Calls any, Does Not Entitle
     Him to an Intradistrict Transfer.

The defendant places significant weight on the fact that the "minimum of fifteen

substantive witnesses" who will be called by the defense at trial all "live and work in the

McAllen area."  Mot at 16.  The fact that witnesses must travel to attend trial does not entitle the

defendant to an intradistrict transfer.  In *Alvarez*, the Fifth Circuit found that the fact that the

court transferred the trial "over 300 miles from where the parties and their counsel resided" was

"insufficient to reverse the district court's decision to transfer venue."  561 Fed. Appx. at 381.

The Fifth Circuit found this, in large part, because the distance did not actually prevent the

defendant from calling witnesses in his defense.  *Id.*  Notably, the Fifth Circuit rejected the

defendants' invocation of *Garza*, finding that the distance did not hinder the defendants' ability

to present their defenses even though "the location was less convenient for the parties." *Id.* Regarding the defendants' claim that the "Houston location prevented the parties from calling witnesses," the court noted that none of the defendants had called any witnesses during the defendants' previous trial in McAllen, which was more convenient for such witnesses, according to the defendant. *Id.*

*Alvarez* highlights an issue with the defendant's argument that the trial should be moved to McAllen for the convenience of the witnesses he plans to call—the defendant is not required to present any defense witnesses at all. The defendant asserts that he intends to mount a significant defense case, but in several months, after seeing the government's case in chief, he may decide not to present any witnesses. There is no means for the court to require a commitment from the defendant to call these numerous witnesses from the McAllen area—it is his constitutional right not to do so. But if he exercises his right to hold the government to its burden, the trial would have been transferred for the convenience of witnesses who never testified.

> 3. This Court Should Hold a Hearing to Determine Whether Any of the Defendant's Anticipated Witnesses Will Offer Admissible Testimony.

Examining the defendant's anticipated witnesses, there are questions as to the admissibility of their anticipated testimony. Indeed, the government intends to file motions in limine at the appropriate time to exclude the very evidence on which the defendant claims he will rely. Given the questionable admissibility of the testimony of the fifteen or more witnesses the defendant intends to call, and the simple fact that the defendant is not required to present any witnesses, there are disputes as to the "critical facts" relating to the requested intradistrict transfer. *See United States v. Montemayor*, No. CRIM. H-13-0039, 2013 WL 4459056, at *4 (S.D. Tex. Aug. 16, 2013) (suggesting that that where the "critical facts" relating to an

intradistrict transfer are in dispute, a hearing is appropriate).  Therefore, this court should hold a

hearing and require an offer of proof from the defendant as to whom he intends to present at trial

so that the court can determine whether or not they will present relevant evidence.

The defendant asserts that he will call witnesses relating to four general categories of

evidence:

1. the "defendants in the state-court criminal cases, all of which were represented by the attorney cooperating with the Government" (Mot at 17, item (g));

2. the "the state-court criminal cases that are the subject of the indictment" (Mot. at 16-17, items (f) and (i));

3. the defendant's fundraising efforts in connection with his political (Mot. at 17-18, items (i) and (k)); and

4. the defendant's fundraising efforts in connection with his charitable foundation (Mot. at 17-18, items (i) and (l)).

The testimony of these witnesses does not appear to be relevant or admissible,

undermining the defendant's proffered need for a transfer and creating a dispute as to the

"critical facts" relating to the transfer.

a.   Criminal Defendants

The government does not intend to call as witnesses in its case in chief the "defendants in

the state-court criminal cases, all of which were represented by the attorney cooperating with the

Government." (Mot at 17, item (g)).  The indictment does not allege that any of Attorney A's

clients were involved in the bribe payments.  Indeed, the three charged bribes were conducted by

Attorney A at the direction of the FBI with no knowledge or involvement by Attorney A's

clients.  Accordingly, the testimony of these individuals is not relevant to the charges.  To the

extent the defendant maintains that these witnesses have other testimony relevant to the defense,

this court should require the defendant to make an offer of proof as to their relevant testimony at

an evidentiary hearing.

### b.  Court Witnesses

The defendant asserts that he will need "numerous witnesses relative to the disposition of the state-court criminal cases that are the subject of the indictment (such as numerous courtroom personnel, district clerk personnel, numerous state prosecutors, bailiffs and criminal defense attorneys)."  Mot at 16.  Presumably, these witnesses will be asked to testify about the merits of the official acts the defendant is alleged to have taken, or that the defendant would have taken such official acts even if he had not accepted a bribe.  This testimony is inadmissible.

The bribery charges against the defendant require the government to prove that he accepted things of value from another person "with the intent to be influenced in connection with any business."  Pattern Jury Instructions, 2.33B; 18 U.S.C. § 666(a)(1)(B).  The government need not prove that the judicial decision undertaken by the defendant was incorrect or not supported by the law.    This is because "*acceptance* of the bribe is the violation of the statute, not *performance* of the illegal promise."  *United States v. Brewster*, 408 U.S. 501, 526 (1972) (emphasis added).

The Fifth Circuit has held that it is not a defense to bribery that a public official would have performed an official act, or the same official act, even without having been paid a bribe in exchange for that official act.  *United States v. Grace*, 568 F. App'x 344, 350 (5th Cir. 2014), *as revised* (May 22, 2014); *United States v. Reeves*, 892 F.2d 1223, 1226 (5th Cir. 1990) ("[A] defendant charged with extortion cannot ask the jury to ignore the extortive acts and rely simply on the lawfulness of the act for which the extortion is performed."); *see also, e.g. City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1991) (internal citations omitted) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid.  That is frequently the defense asserted to

a criminal bribery charge—and though it is never valid in law, it is often plausible in fact.").

Therefore, the merits of the actions taken (or not taken) by the defendant is irrelevant to the

charges and therefore inadmissible.  The government intends to file a motion in limine to exclude

any such testimony regarding the merits of any of the defendant's official acts.

To the extent the defendant maintains that these witnesses have other testimony relevant

to the defense, this court should require the defendant to make an offer of proof as to their

testimony at an evidentiary hearing.

c.  <u>Foundation Witnesses</u>

The defendant asserts that one "pertinent factor in the instant case" is that the defendant

"assisted in operating a foundation in the name and honor of his deceased son; the foundation

gave annual scholarships to students, drawn from an annual fundraising auction."  Mot. at 15.

To the contrary, there is no apparent relevance of the foundation to this case.

The defendant and his wife operate a scholarship fund in memory of their son who died

prematurely at the age of 16, the Ramon David Delgado Charitable Trust (the "scholarship

fund").  The scholarship fund has no bearing on the charges against the defendant—conspiracy

to commit bribery, bribery, using a facility of interstate commerce in furtherance of bribery, and

obstruction of justice.  There is no allegation or suggestion that the bribe payments from

Attorney A to the defendant over the ten years of the criminal relationship alleged in the

indictment were ever intended as scholarship fund contributions.  In fact, the defendant claimed

in his false exculpatory text message that underlies the obstruction of justice count that he

believed the cash bribe payment he received in January 2018 to be a campaign contribution, not

a foundation donation.

16

Furthermore, the existence of the scholarship fund is not relevant to the defendant's character, and even if it were, the defendant's character is not relevant in this case. *See* FED. R. EVID. 404(a) ("evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").  Should the defendant seek to introduce evidence of the scholarship fund, the only purpose will be to garner sympathy for the defendant because of the tragic circumstances of the defendant's son's untimely and unexpected death.  While the circumstances are undoubtedly tragic and the purpose behind the scholarship fund is noble, the evidence of the defendant's involvement in the scholarship fund is not relevant to this trial.

To the extent the defendant maintains that the foundation is otherwise relevant to the defense, this court should require the defendant to make an offer of proof as to their testimony at an evidentiary hearing.

### d.  Campaign Witnesses

It is undisputed that the defendant was, and is, a candidate for the 13th District Court of Appeals during some of the time covered by the indictment.  It is also true that the defendant is charged with sending a false exculpatory text message to Attorney A, claiming that the January 2018 bribe payment was a campaign contribution.  However, the indictment is otherwise silent on involvement of the defendant's campaign.  Even if the payments from Attorney A to the defendant were campaign contributions—which they were not—they are still bribes because they were given in exchange for the defendant's agreement to perform official acts.  Therefore, testimony regarding the defendant's other campaign fundraising activities is not relevant.  *See* Mot. at 17-18.  To the extent the defendant maintains that his campaign committee is otherwise

relevant to the defense, this court should require the defendant to make an offer of proof as to the admissible witness testimony at an evidentiary hearing.

**B.  The Need for the Prompt Administration of Justice Does Not Favor an Intradistrict Transfer**

This case was indicted in February 2018 and after two agreed-upon continuances is firmly set for trial in February 2019.  A transfer to the McAllen Division, a very busy court with fewer Article III judges than the Houston Division, could lead to scheduling delays and any further delay of the trial in this matter should be avoided.  In cases involving public officials corrupting the administration of justice, the public has an even stronger right to having the trial tried as expeditiously as possible.  *See e.g. United States v. Ackal*, 2016 WL 4922854, *1 (W.D. LA, 2016) (noting that in public corruption trial of elected sheriff, the public had a strong right to having the case tried expeditiously.).  That the defendant is willing to waive his right to a speedy trial to accommodate the delay "does not alter a court's duty to consider the prompt administration of justice as a factor."  *Dickie*, 775 F.2d 610.

In contrast to the possibility of a delay if this case is transferred to the McAllen Division, there is no apparent danger of a delay if the case remains in the Houston Division.  The court and all parties have cleared their schedules and set aside ample time for the trial.  Insofar as there is a danger of delay in transferring the trial to the McAllen Division, the prompt administration of justice factor weighs against an intradistrict transfer.  *See Garza*, 593 F.3d at 389 (discussing the need to avoid "substantial delay" in intradistrict transfers).

### C. **Other Factors Properly Considered by the Court Do Not Favor an Intradistrict Transfer.**

1. There has been Substantial Pre-Trial Publicity in McAllen and Virtually None in Houston

The Sixth Amendment affords a defendant in a criminal trial the right to a fair trial before an impartial jury.  In recognition of this right, it is well-established that pretrial publicity may have had such an impact upon the populace from which the jury is drawn as to create a probability or at least a "reasonable likelihood" that this right of impartiality has been violated. *See Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  Indeed, the Fifth Circuit affirmed a district court's intradistrict transfer from a division with substantial pre-trial publicity to a division with none.  *Dickie*, 775 F.2d at 610.[7]  The court also noted that the prompt administration of justice was "strongly promoted" "by avoiding problems raised by extensive publicity."  *Id.*

As is described above, the defendant's case has garnered significant media attention in the county that makes up the vast majority of the McAllen Division.  In addition to the expected media attention caused by the arrest of so prominent a local official, because the defendant is running for a statewide judgeship in an election year, there was significant media focus on implications to the election of the 13th Court of Appeals.  This was further emphasized by the defendant's resignation from the 93rd Judicial District Court, which began a several months-long search for a replacement to run in a special election in November.  Every time the media covered the candidates vying for the nomination to fill the vacancy left by the defendant, the media devoted time to discussing the charges against him.  As such, the media coverage in this case has been significantly greater than other cases cited by the defense in its motion.  However by

---

[7]        The defendant argues that "trial in Houston would impede press coverage in the community impacted by the alleged corruptive activities."  Mot. at 4.  While the defendant is correct that "the media in McAllen and surrounding areas have a vested First Amendment interest in the reporting of the instant case," the McAllen media has successfully reported on case developments occurring in Houston since the indictment.  *See* Ex. B.

comparison, there has been scant attention in the Houston Division, which is nearly seven times as large.

The Fifth Circuit has found that it is appropriate to consider the relative impact of the media coverage given the size of the jury pool.  *See Ackal*, No. 2016 WL 4922854, at *6 (in a public corruption case with significant media attention, the court noted that "relevant publicity has attracted a significant amount of community attention, particularly when taking into consideration the relative size of the communities from which juries are drawn").  With a much smaller jury pool, a high-profile defendant, and a significant amount of press coverage of the defendant's charges, it is highly likely that potential jurors in the McAllen Division will have prior knowledge of the defendant and the case.  In the Houston Division, the likelihood of such prior knowledge is nearly zero.

In a case involving local public officials from Odessa, Texas, including a City Councilman and the Mayor, the Fifth Circuit affirmed the district court's decision to transfer the case away from the Midland-Odessa Division to a new division.  The district court had noted that "there was in inordinant [sic] amount of publicity and I do not believe that it would be fair to either [defendant] or the Government to attempt to try to select a jury there."  *See United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir. 1986).  The Fifth Circuit also noted the "extensive publicity surrounding the first trial of these local public officials" and determined that a trial in the division where the local public officials resided and served "would not further the administration of justice."  *See United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir. 1986).  So, even though the transfer to El Paso, Texas was "inconvenient" to the Defendants and their witnesses, the Court was required to fix the trial with due regard to the "prompt administration of justice," which ultimately outweighed the other two factors.  *Id*.

To be certain, the government is not asserting that the media coverage of the defendant's case is "inflammatory and of a nature that would influence a juror's decision," as the court found that the media attention had been in *Ackal*.  2016 WL 4922854, at *6.  Rather, the significant media attention, prominence of the defendant in the McAllen area, and the relatively small size of the McAllen Division explain why the government chose to bring this case in the Houston Division, and why it should not be transferred to the McAllen Division.  Selecting a jury with no prior knowledge of the defendant or his charges will be significantly difficult.

The defendant relies *Lipscomb* (Mot. at 11-12), wherein the Fifth Circuit reversed the district court's *sua sponte* transfer of the trial of a former city council member for bribery, based on the court's concerns that it could not seat an impartial jury due to significant pretrial publicity. 299 F.3d at 338.   However, in that case, the Fifth Circuit's reversal did not rely on the question of whether the pretrial publicity was too great or not, but rather it found that this *sua sponte* transfer was an abuse of discretion because of the court's lack of consideration of the multiple factors at issue in an intradistrict transfer.  *Id*. at 340-48.  The court devoted several pages of analysis to each relevant factor, noting that the district court erred in not considering each, with the exception of pretrial publicity.  *Id*.  In this case, an analysis of the multiple factors, including pretrial publicity, lead to the conclusion that an intradistrict transfer is not warranted.

2.  Overall Case Loads

The term "prompt administration of justice" refers not only to the administration of this case, but to other cases on the court's docket.  Indeed, docket management "may even outweigh convenience factors that point entirely the other way."  *See Ackal*, 2016 WL 4922854 at *4 (internal citations omitted); *Lipscomb*, 299 F.3d at 342.  The McAllen Division is one of the busiest in the Southern District of Texas, if not the country.  With hundreds of offenses charged per day, the time and resources of the three Article III judges in McAllen are consistently at a

21

premium. Even if this court tries the case in McAllen, instead of one of the McAllen Division

judges, trial would likely displace one of the sitting judges from their court rooms and interrupt

their dockets. In contrast, the Houston Division has many more judges and fewer criminal cases,

making it more conducive to a longer trial, such as this one, scheduled for two full weeks.  The

relative caseloads of the two divisions is one of the reasons the government brought the case in

Houston instead of McAllen, and is a proper factor for this court to consider in denying the

defendant's motion for an intradistrict transfer.

> 3.   Location of Evidence

The defendant argues that the trial should be transferred to McAllen because much of the

evidence was collected in the McAllen area, but the evidence is now located in Houston, Texas.

Accordingly, the location of the evidence weighs against an intradistrict transfer.  *See e.g. United

States v. Sapyta*, 390 F.Supp.2d 563, 571 (W.D. TX 2005) (noting that venue is proper in

location where some of the witnesses, the prosecutor, and the evidence is located).

### D.  The Defendant is Not Entitled to A Jury with a Specific Ethnic or Cultural Makeup.

The defendant asserts a right to a jury that is familiar with "the context of cultural and

professional norms in the McAllen area" so that they may evaluate "the nature of different types

of relationships and the reactions by different individuals to certain acts."  Mot at 17 (item (h)).

The defendant further asserts, without support, that "[t]he appreciation and understanding of

these local cultural and professional issues will necessarily be different in McAllen than

Houston."  *Id*.  The defendant appears to be asserting a right to a jury *with* prior knowledge of

the case, something his is decidedly *not* entitled to.   The defendant further appears to request a

jury with a specific ethnic makeup:

> This is not intended as a slight to either city. Rather, it is an
> unmistakable observation of the differentiation that must be made

of the two distant cities in terms of cultural and ethnic makeup and perspectives.

Mot. at 17.  This would be a legally improper basis for a transfer.  *Alvarez*, 561 Fed. Appx. at 382 (noting that defendants have no right to a jury "of any particular composition."); *McKinney*, 53 F.3d at 673  ("[a]n attempt to influence the racial balance of the jury by setting a case in a particular division would not have been appropriate or acceptable, and we note that there is no indication that the district court considered the racial composition of the various divisions in reaching her conclusion."); *Wheeler*, 79 F. App'x 660 ("The Greenville division's higher population of African-American residents should not influence the transfer decision.").

**V.    Conclusion**

For the reasons stated herein, the government respectfully requests that the Defendant's Amended Motion to Change Venue be DENIED.

Respectfully submitted,

*/s/ Peter M. Nothstein*

Peter Nothstein
Trial Attorney
Public Integrity Section

Robert Guerra
Arthur R. Jones
Assistant United States Attorneys
Southern District of Texas

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of August, 2018, I served a copy of the United States of America's Response to Defendant's Amended Motion for Change of Venue on Michael McCrum, counsel for the defendant, Rodolfo "Rudy" Delgado, via CM-ECF.


Respectfully submitted,

*/s/ Peter M. Nothstein*

Peter Nothstein
Trial Attorney
Public Integrity Section

Robert Guerra
Arthur R. Jones
Assistant United States Attorneys
Southern District of Texas