UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 18-CR-00115 |
| | § | |
| RODOLFO "RUDY" DELGADO, | § | |
| DEFENDANT | § | |

**DEFENDANT'S OBJECTIONS TO
PRESENTENCE INVESTIGATION REPORT**

DEFENDANT RODOLFO "RUDY" DELGADO, by and through his undersigned counsel,

submits his objections to the Presentence Investigation Report ("PSR").

**DEFENDANT'S OBJECTIONS
TO PRESENTENCE INVESTIGATION REPORT**

## I.   DEFENDANT'S OBJECTIONS.

Defendant objects to paragraph 44 of the PSR. The probation officer recommends a 26-level

upward adjustment based on "more than one bribe", "value of payment… exceeded $6,500.00", and

"involved an elected public official". As a basic premise, it must be remembered that the Government

has the burden of demonstrating all upward adjustments to the Base Offense. *United States v. Ezukanma,*

756 Fed.Appx. 360, 371 (5th Cir. 2018), citing 18 U.S.C. § 3664(e) & *United States v. Sheinbaum,* 136 F.3d

443, 449 (5th Cir. 1998).

The Probation Office correctly notes that Section 2C1.1 is the applicable guideline section.

Paragraph 44 of the PSR, entitled "Base Offense Level", has multiple guideline adjustments referenced

within the same paragraph. Paragraph 45, entitled "Specific Offense Characteristics", indicates "None".

Section 2C1.1(a) establishes the "Base Offense Level":  14, if the defendant was a public official,

and 12 otherwise. Paragraph 44 of the PSR correctly notes that 14 is the applicable Base Offense Level.

Section 2C1.1(b) provides for certain adjustments if "Special Offense Characteristics" are applicable to

the instant case.[1]

The Probation Office recommends the following upward adjustments:

| Number of Levels | Sentencing Guideline | Alleged Basis for Adjustment |
|---|---|---|
| 2 | 2C1.1(b)(1) | Offense involved more than one bribe |
| 6 | 2C1.1(b)(1)(D) | Value of payment, benefit received or to be received in return for payment, exceeded $6,500 |
| 4 | 2C1.1(b)(3) | Offense involved elected official |

The Probation Office also recommends in PSR Paragraph 48 a 2-level upward adjustment for Defendant's alleged obstruction of justice, pursuant to Section 3C1.1.

Defendant objects to the following recommended upward adjustments:

1. Defendant objects to the 6-level upward adjustment recommended in PSR ¶ 44, pursuant to Sections 2C1.1(b)(2) & 2C1.1(b)(1)(D);

2. Defendant objects to the 2-level upward adjustment recommended in PSR ¶ 48, pursuant to Section 3C1.1.

The evidence does not support the Probation Office's recommendations.

## II. RECOMMENDED 6-LEVEL UPWARD ADJUSTMENT - - U.S.S.G. § 2C1.1

PSR ¶ 44 includes a recommended 6-level upward adjustment on the basis that the value of the payment, the benefit received or to be received in return for the payment exceeded $6,500. Citing Sections 2C1.1(b)(1) and 2B1.1(b)(1)(D) of the Guidelines, the Probation Office indicates in ¶ 44 that

---

[1] The Probation Officer's presentation of recommended adjustments does not track the Sentencing Guidelines. Though the Probation Officer recommends certain upward adjustments in Paragraph 44, the "Base Offense Level" paragraph, in actuality three of them should be listed in Paragraph 45 of the PSR, the "Specific Offense Characteristics" paragraph.

the amount at issue under this Guideline section is $45,000. Presumably, the Probation Office

calculated such amount using the following eight figures:

| 1. | $15,000 | Value of Truck "kept" by Delgado |
|----|---------|----------------------------------|
| 2. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in December 2016 |
| 3. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in November 2017 |
| 4. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in January 2018 |
| 5. | $10,000 | Value of $10,000 personal recognizance bond approved for Noe Perez client M.N. |
| 6. | $5,000 | Value of $10,000 personal recognizance bond approved for Noe Perez client S.M. |
| 7. | $250 | Payment received by Defendant re: Noe Perez' client S.G. |
| 8. | $250 | Payment received by Defendant re: Noe Perez' client J.R. |
| | **Total:  $45,500** | |

*See* PSR ¶ 37.[2]

The number of levels for this type of adjustment is driven by two factors:  (a) the amount of

money that fits within the description in Section 2C1.1(b)(2), and (b) the number of levels that such

amount corresponds to in the table of Section 2B1.1(b)(1). In the instant case, the recommended six-

level upward adjustment is driven by the Probation Office's conclusion that the amount exceeds

$40,000, warranting a six-level increase under Section 2B1.1(b)(1)(D).

The accuracy of the Probation Office's recommendation depends on whether the "values" it

used are correct and whether each of the items listed on the table above should be considered under

this Specific Offense Characteristic.

[2] The amounts listed in PSR ¶ 37 add up to $45,500. In PSR ¶ 37, the Probation Officer indicates that
"Delgado is held accountable for a total amount of $45,500." In PSR ¶ 44, however, the Probation Office
indicates the amount is $45,000. Based on the statements in ¶ 37, undersigned counsel assumes the Probation
Office meant to type $45,500 in ¶ 44.

### $15,000 Based on Alleged "Keeping" of Truck

The first item listed by the Probation Office is $15,000, corresponding to the value of the truck that the Probation Office indicates was allegedly "kept" by Defendant. There are several flaws in using this amount in the consideration of Section 2C1.1(b)(2).

First, the evidence did not prove that the truck was worth $15,000. The Probation Office states in PSR ¶ 20 that Mr. Perez "estimated" that the truck was worth $15,000. Not only is this insufficient evidence to place a value on the item, the evidence actually proved that $11,000 was paid for the truck.

Second, the evidence did not prove that Defendant "kept" the truck without paying for it. Although Mr. Perez testified that Defendant did not pay for the truck, this completely defies logic. Mr. Perez stated that never before had he had a discussion with Judge Delgado about doing anything improper, illegal or inappropriate, nor had he seen or heard of Judge Delgado doing so. Also, Mr. Perez testified that Judge Delgado did not say anything at that time or after about why he was allegedly "keeping" the truck without paying for it. That is, he testified that there was no discussion that Judge Delgado would do anything for Mr. Perez in exchange for "keeping" the truck without payment. Mr. Perez stated he never raised the subject with Judge Delgado, and just hoped that someday Judge Delgado would grant him a favor on one of his cases. It is illogical to an extreme that Judge Delgado would "keep" a truck without paying for it, from a person who he had never dealt with, and without saying anything to that person about why he is keeping it. To think that Judge Delgado would keep a truck, not say anything about payment nor discuss or propose an arrangement of some kind with a lawyer that Judge Delgado did not know well at that point, involve a third person owner of a car dealership by introducing Mr. Perez and leaving them to work out the title transfer, is ludicrous and does not meet the burden of proof that the Government is obligated to meet to justify inclusion of this amount. Conversely, there is abundant evidence that Mr. Perez experienced marital issues, did not

want to give the truck to his wife's brother, and had incentive to lie to his spouse about having sold the truck to Judge Delgado.

The Probation Office asserts facts relative to this transaction in paragraphs 20 through 22 of the presentence report. These paragraphs, however, do not accurately describe the event. In ¶ 20, it is noted that Mr. Perez claimed he met with Judge Delgado in a local bar. Mr. Perez testified that he had drinks with Judge Delgado on that occasion. The evidence proves, however, that Judge Delgado had stopped drinking during that time period because he was diagnosed with cancer. Moreover, the evidence proved that he did not speak with Mr. Perez about the vehicle until November or December 2008, not in January.  PSR ¶ 20 also indicates that the documents were "falsified." There is no evidence to support this allegation, as there was nothing about the documents which included false statements. While it is true that the owner of the dealership later stated that he wrote Rico Delgado's name on the documents, that was done by permission from the Delgados, due to Rico's unavailability. Also, PSR ¶ 21 does not comport with Mr. Perez' testimony.  He testified that nothing was discussed about Judge Delgado about any pending case, and that he did not know or expect anything in advance about anticipating Judge Delgado's help.  As to the progress of Mr. Perez' client's case described in ¶ 22, it must be considered that the State of Texas ultimately filed a motion to dismiss E.M.'s probation. The decision to not revoke E.M.'s probation was evidently a good decision, given E.M.'s compliance with all conditions after such date and the State's ultimate dismissal. Given the lack of credible evidence that an agreement was entered between Mr. Perez and Judge Delgado relative to the sale of this truck in exchange for official action, no monetary value should be included in an assessment under Section 2C1.1(b)(2).

Notwithstanding the fact that there should be no monetary value assessed as part of this "truck" event, Defendant points out that the Sentencing Guidelines provide that only the "net value" of amount at issue should be considered. U.S.S.G. § 2C1.1, n. 3. If the Court were to choose to include

consideration of this event, this application note principle is applicable to this event. The preponderance of the evidence indicates that Mr. Perez was paid $11,000 for this truck, which was an equal exchange of value.

**The "Value" of a Personal Recognizance Bond**

As noted above, the Probation Office included in its calculation the full amounts of the personal recognizance bonds that were allegedly approved in exchange for the payment of bribes. The Probation Office included the following under the category, and sometimes listed the value of the alleged bribe that was given in exchange for the official action:

| Amount Assessed by Probation Officer | Stated Reason for Inclusion | Amount of Alleged Bribe |
|---|---|---|
| $5,000 | $5,000 personal recognizance bond approved for Noe Perez client in December 2016 | $260 payment PSR ¶ 27 |
| $5,000 | $5,000 personal recognizance bond approved for Noe Perez client in November 2017 | "gave something" PSR ¶ 28 |
| $5,000 | $5,000 personal recognizance bond approved for Noe Perez client in January 2018 | $5,500 payment PSR ¶ 29 |
| $10,000 | $10,000 personal recognizance bond approved for Noe Perez client M.N. | "purchasing wood" PSR ¶ 30 |
| $5,000 | $10,000 personal recognizance bond approved for Noe Perez client S.M. | "purchased wood" PSR ¶ 33 |

There are several important considerations relative to the Probation Officer's decision to assess a value commensurate to the amount that would be paid if (a) the defendant's bond was revoked, and (b) the court would impose an obligation on the defendant to pay the face amount of such bond. As

noted above, Section 2C1.1(b)(2) offers, as an additional "Specific Offense Characteristic," the discretion to impose an additional upward adjustment for:

1. **The "value" of "the payment" (i.e., the "value" of the bribe paid to the official); or,**
2. **The "value" of "the benefit received in return for the payment" (i.e., the "value" of the benefit received by the payor of the bribe**; or,
3. The "value" of "the benefit to be received in return for the payment" by the payor of the bribe (this does not appear applicable to the instant case); or,
4. The "value" of "anything ordered or to be obtained by a public official" (i.e., in cases where the bribe has not yet been paid; this does not appear to be applicable to the instant case); or,
5. The "value" of "the loss to the government from the offense" (this does not appear to be applicable to the instant offense).

The highlighted clauses in numbers 1 and 2 appear to be the only applicable provisions to the instant case. As reflected in the PSR, the Probation Office used the first method on the events numbered 1, 7 and 8, in the table below, and the second described method on the events numbered 2 through 6, below:

| 1. | $15,000 | Value of Truck "kept" by Delgado |
|----|---------|----------------------------------|
| 2. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in December 2016 |
| 3. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in November 2017 |
| 4. | $5,000 | Value of $5,000 personal recognizance bond approved for Noe Perez client in January 2018 |
| 5. | $10,000 | Value of $10,000 personal recognizance bond approved for Noe Perez client M.N. |
| 6. | $5,000 | Value of $10,000 personal recognizance bond approved for Noe Perez client S.M. |
| 7. | $250 | Payment received by Defendant re: Noe Perez' client S.G. |
| 8. | $250 | Payment received by Defendant re: Noe Perez' client J.R. |
| | **Total:  $45,500** | |

*See* PSR ¶¶ 20-22, 27-30, 33 & 37.

The question is whether these "values" are appropriately assessed. In the category in which the Probation Office used the face amount of the personal recognizance bonds (i.e., event numbered 2 through 6, above), the PSR is silent as to why the Probation Office considers the "value" of the

personal recognizance bond to be the amount that would be the possible consequence for violation of the bond. Several questions must be considered:

1. When a defendant is approved for a $5,000 personal recognizance bond, what is the "value" of "the benefit that is received"?

   a. That is, since a defendant does not have to pay for his release on bond, and is instead released on his promise to appear, what is the "value" of that benefit?

   b. Is the "value" he receives the savings he reaped in not having to pay 10% to a surety?

   c. In getting a PR bond, the defendant did not have to pay anything; he was released on the basis of his promise to appear. Additionally, if the defendant complies with his bond and appears in court, he never has to pay $5,000.

   d. Further, the evidence at trial actually proved that release on a PR bond is more burdensome to the defendant than being released on a surety bond, where a deposit is required.

   e. The $5,000 figure on the PR bond is merely an amount that possibly be due if two conditions occur: (a) the defendant's bond is revoked, and (2) the court orders that the defendant pay the amount of bond for his breach. Clearly, a defendant is never ordered to pay the face amount of the bond once revoked, so the possibility of the second condition occurring is remote, if not nonexistent.

2. When a lawyer pays a bribe to a judge for consideration on a case (i.e., that a client be released on a personal recognizance bond), a benefit is received by the lawyer (who appears to his client that he has obtained a good result) and the client (who is released on bond). Which "benefit" should be considered for purposes of Section 2C1.1(b)(2)?

   a. The benefit to the lawyer who secretly paid the bribe?  In other words, how much of his fee from the client was tied to the lawyer being able to secure a PR bond for

his client?  What benefit is the lawyer receiving for being able to secure a PR bond for his client?

b. The benefit to the lawyer's client who was released on bond without having to pay anything?

These questions must be answered in a way that justifies imposing the face amount of the PR bonds. This burden is on the Government to justify the upward adjustment that the Probation Office proposes. In the Defendant's view, the "value" of a PR bond is impossible to calculate, and the Probation Office's use of the face amounts of these "personal recognizance" bonds is without substantive support or reasoning. Though it may be easy to use this amount, as it contains a number that is readily identifiable, there are two notable factors which counsel against use of this number: (a) the character of a personal recognizance bond does not lend itself to "valuing" the PR bond by using the potential "consequence" for violating the bond, and (b) the fact that the defendant who receives permission to be released on a PR bond is not the "payor" of the bribe who is expecting a benefit in exchange for the payment of the bribe (that is, it is the lawyer who pays the bribe and who expects to receive a  benefit - - the ability to secure a PR bond for his client).

The Commentary to Section 2C1.1 provides the following guidance:

> In a case . . . in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe.

*See* U.S.S.G. § 2C1.1, Background.

This is the situation with respect to this category. It is impossible to value the benefit received to the lawyer for his bribe to obtain a PR bond for his client. Clearly, the evidence indicates that Mr. Perez and Judge Delgado ostensibly agreed that payment of $260.00 was sufficient to accomplish two goals:  (1) to obtain firewood; and, (2) to pay Judge Delgado to approve a PR bond for Mr. Perez' client. According to Mr. Perez, he paid this amount on several occasions to Judge Delgado, and in

return received a two-fold benefit:  firewood and the approval of a PR bond for his client. Clearly, the "value" of the official action was less than the $260 paid by Mr. Perez, since a portion of that amount was required to purchase the firewood.

Event number 4 in the table above carries a different fact. As was evident in trial, Mr. Perez delivered $5,500 to Judge Delgado in January 2018. A PR bond was approved subsequent to said delivery. The Probation Office recommends $5,000 as the amount applicable to Section 2C1.1(b)(2), on the same basis as other "PR Bond" events (i.e., a $5,000 PR bond was approved). In this situation, it would be improper not only to use the amount designated as the consequence for breach of the bond (i.e., $5,000), but also improper to use the amount paid by Mr. Perez (i.e., $5,500). Clearly, there was evidence introduced that $250-$260 dollars per event was paid in order to secure a PR bond for Mr. Perez' clients. There is no evidence to indicate that the defendant relative to the event in January 2018 carried any unusual circumstance that required a more expensive bribe. It was the same type of case and same type of situation. There was evidence, however, to show that Judge Delgado was accepting contributions for two projects he was working on:  a political campaign and a foundation. There is evidence that Mr. Perez wanted to be a contributor, just as scores of other professionals and non-professionals were doing. It was never made clear in the evidence that the full amount of $5,500 was paid as a bribe. For all of these reasons, use of either of these amounts in the assessment of an upward adjustment under Section 2C1.1(b)(2) is improper and not supported by a preponderance of the evidence.

For all of the reasons expressed above, Defendant objects to using the amounts designated as the consequence for breach of a PR bond, and objects to the use of the $5,500 amount paid in January 2018 to justify upward adjustments under Section 2C1.1(b)(2). Conversely, use of an amount less than $260 per event is the course of action recommended by the Sentencing Guidelines. Based on these

principles, there should be no upward adjustment under Section 2C1.1(b)(2), as the values of the payments of the bribes and/or the value of the benefits received are cumulatively less than $6,500.00.

## III.   RECOMMENDED 2-LEVEL UPWARD ADJUSTMENT - - U.S.S.G. § 3C1.1

The Probation Office recommends a two-level upward adjustment based on Section 3C1.1. *See* PSR ¶ 48. Defendant objects to this upward adjustment of levels. The Commentary to Section 3C1.1 provides that Section 3C1.1 is inapplicable if the defendant is convicted of an offense covered by Section 2J1.2. *See* U.S.S.G. § 3C1.1, n. Inapplicability of Adjustment in Certain Circumstances. Appendix A to the Sentencing Guidelines expressly provide that convictions for violation of 18 U.S.C. § 1512(c) are covered by Section 2J1.2 of the Guidelines. Accordingly, Section 3C1.1 does not apply, and the recommendation for the upward adjustment is improper.

## IV.   CORRECTIONS & CLARIFICATIONS TO PSR

Defendant requests that the following corrections and clarifications be made to the presentence report.

Pg. 3:  Judge Delgado's education is not a master's degree. He graduated with a Juris Doctor degree from the University of Texas.

¶ 17:  The information appears to indicate that Judge Delgado was the subject of Mr. Perez' nefarious activity and a source who received a demand from Mr. Perez for $10,000.  The evidence is clear that this situation involved a different judge and not Judge Delgado.

¶ 18:  The Probation Office indicates that Judge Delgado "solicited and demanded" things of value from Mr. Perez. The evidence does not support the allegation. There is no evidence that Judge Delgado solicited or demanded payment of a bribe. Moreover, although there is evidence that Judge Delgado received things of value, the evidence is clear that there was no "quid pro quo" as to said payments. That is, there was never an agreement of an exchange for judicial action, as expressed in ¶ 18. Judge Delgado never requested meetings with Mr. Perez; it was Mr. Perez who initiated all contact.

Moreover, when meetings were set up, it was never for the purpose of discussing a bribe situation (at least from Judge Delgado's perspective). The meeting may have evolved into discussion which the Government asserted was a bribe scenario, but it was not what was discussed as the purpose of the meeting. These factors are important in assessing whether there are mitigating factors relative to the offense conduct. Similarly, as to ¶ 25, it was never discussed with Judge Delgado that Mr. Perez' visits to Judge Delgado's residence was the for the purpose of seeking favors from Judge Delgado. Indeed, the nature of the conversations that were taped indicated that Judge Delgado enjoyed conversing with Mr. Perez on a variety of personal subjects not involving Judge Delgado granting official favors. As to other statements in ¶ 25, it should be noted that firewood was not sold at Judge Delgado's residence until 2014.

¶ 26:  There is no corroboration for these visits, nor any indication of cases in which favorable consideration was given in exchange for a bribe. For example, the "habeas" matter referred to in this paragraph actually involved the State of Texas prosecutor's agreement that it should be granted.

¶ 27:  As the Court is aware, undersigned counsel amassed significant data to indicate that PR bonds are routinely given in this jurisdiction. The evidence indicates that all PR bonds are considered in open court, with the State prosecutors there to object if they deem it appropriate. The PR bonds at issue in the instant case all involved the State's concurrence or non-objection. These factors must be taken into consideration and included in the PSR in order to give context to the approval of PR bonds. Moreover, an examination of the files at issue show that the approval of PR bonds was appropriate given the nature of the offense in each case, the level of criminal history, the reasons for the proposed detention (for example, technical violations of probation for non-payment of fees and absence of new offenses committed while on probation), and the resulting non-violations by the defendant released on bond.

¶ 28:  By way of mitigation and clarification, the video does not show that Mr. Perez gave anything to Judge Delgado other than papers to review. In fact, Mr. Perez stated to Judge Delgado during the recording that he did not have his wallet, yet he purchased gas at the convenience store and paid for beer with cash. The FBI agents were listening and watching the video, and they admitted that they did not know if Mr. Perez had given money to Judge Delgado.

¶ 29:  The Probation Office again misstates the evidence.  There was nothing in the text message sent by Mr. Perez that he did not want to give Judge Delgado something in a public place. Mr. Perez did not say verbally to Judge Delgado that he had $5,500 "if" Judge Delgado would grant a bond. Additionally, the yellow paper referred to in this paragraph was a paper written by Judge Delgado while Mr. Perez and the prosecutor were both sitting in his chambers discussing the case. All of these factors should be clarified in the PSR to accurately reflect what happened.

¶ 30:  Defendant objects to this information, as there is no evidence to support that this happened.

¶ 31:  Defendant objects to the Probation Office's characterization of the list given by Mr. Perez. An analysis of this list does not indicate that Mr. Perez received favorable consideration in exchange for the payment of bribes. Also, as to the conviction being vacated, the State of Texas agreed to this resolution.

¶ 32:  The State of Texas dismissed this proceeding. This was the result of a negotiation between the defense attorney and the State of Texas. Judge Delgado objects to its inclusion.  The statements in ¶ 33 are the same thing.

¶ 34:  Defendant objects to the inclusion of this paragraph. The visit by this attorney is being taken out of context, as the Government has reached to prove some violation other than Mr. Perez' interaction with Judge Delgado. Without credible evidence, Defendant objects to its inclusion and consideration.

¶ 35:  Again, Defendant must object to the inclusion of this paragraph and its implication that something nefarious was done by Judge Delgado in connection with this attorney. Ultimately, Judge Delgado did not set the matter for hearing, and there is no evidence that Judge Delgado did anything inappropriate with respect to this matter.

¶ 36:  As reflected in Defendant's position at trial, there is no evidence that Judge Delgado knew there was a grand jury proceeding. He was never informed, formally or informally, by anyone that he was under federal investigation for accepting bribes. The information that was published on social media indicated there was an investigation of a judge whose court number began with a 9. The information that was given to Judge Delgado by Senator Chuy Hinojosa was that he had heard there was a federal investigation dealing with a "mesh" case and something about firewood. Nothing was ever said about a grand jury proceeding.

¶ 41:  The presentence report states that the defendant would provide a written statement at a later date regarding his involvement in the offense. It further states that as of the time of the writing of the presentence report that no statement had been provided. It should be noted, however, that Judge Delgado did write a letter which was included in the PSR about his abuse of alcohol during all relevant time periods and how it impacted his judgment.

¶ 57:  This paragraph is factually incorrect. Defendant was not involved in any car accident. He was a block away from a car accident, and he and others walked to the scene to see if everyone was okay. At the scene, he saw that it initially involved two vehicles, and then a third vehicle crashed into the original two vehicles. There were injured persons and mass confusion. People from the second and third vehicles were fleeing the scene of the accident on foot, and Judge Delgado assisted the first Edinburg police officer who responded by pointing out some people who were involved in the accident. During this time, there was an altercation involving Judge Delgado's brother and an individual who had been driving the third vehicle. By then, other police officers had arrived and they

immediately arrested Judge Delgado for public intoxication and disorderly conduct. The next day, Judge Delgado was charged with assault, even though it was his brother who committed an assault. The person who swore to Edinburg police that he was struck by Judge Delgado commenced his statement by giving false statements. He stated his name was Jorge Luis Gonzalez, even though his name was Benjamin Ornelas. It was later revealed that the reason he gave a false name was due to the fact that he had a criminal record and was a fugitive from justice at the time. Nonetheless, the State of Texas presented him before the grand jury to give his testimony. A trial was conducted, and Judge Delgado was found not guilty. He filed a lawsuit and was awarded a settlement by the City for $100,000 for the officers' unlawful actions against him.

¶ 58:  Again, the statements in this paragraph are factually incorrect. Defendant was arrested for DWI, and the government added a charge of evading arrest. Yet, the grand jury no-billed the evading arrest and a year or so later the DWI was dismissed.  There was a political dispute between Judge Delgado and the same district attorney who had presented the evading arrest charge from two years earlier. The District Attorney chose to re-submit the evading charge to a different grand jury. All charges were ultimately dismissed in June 2007 upon Judge Delgado's filing of a motion to dismiss for outrageous governmental conduct.

¶ 64:  Rodolfo Delgado did not go to Thurgood Marshall law school; he graduated from St. Mary's University School of Law. Rico Delgado went to Thurgood Marshall.

¶ 73:  Defendant never attended Thurgood Marshall School of Law.  He attended and graduated from the University of Texas School of Law.

Defendant requests that his objections are granted, that all corrections and clarifications are made

to the presentence report, and that he be granted such other and further relief as this Court deems appropriate.

Respectfully submitted,

_/s/_ Michael McCrum_____
Michael McCrum
State Bar No. 13493200
McCrum Law Office
404 E. Ramsey, Suite 102
San Antonio, TX 78216
(210) 225-2285
(210) 225-7045 (fax)
**ATTORNEY FOR DEFENDANT RODOLFO DELGADO**

## Certificate of Service

I hereby certify that on the 11th day of September 2019, a copy of the above and foregoing objections was delivered to the United States Probation Office via electronic mail; and that on the 12th day of September 2019, a copy of the above and foregoing objections was delivered to United States Probation Office  and to the United States Attorney's Office via the CMF electronic filing system.

_/s/_ Michael McCrum_____
Michael McCrum