UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | CRIMINAL NO. 15-cr-118 |
| v. ) | Hon. Alfred H. Bennett |
| ) | |
| ) | |
| ) | |
| RODOLFO "RUDY" DELGADO, ) | |
| Defendant. ) | |
| ) | |

## GOVERNMENT'S SENTENCING MEMO

The United States of America, by and through undersigned counsel, respectfully submits this sentencing memorandum to aid in the Court's determination of the appropriate sentence for the defendant, Rodolfo "Rudy" Delgado. For the reasons stated herein, the government respectfully submits that this Court should impose a sentence of incarceration at the high end of the properly-calculated advisory guidelines range—97 months.

I.   INTRODUCTION

The government's evidence at trial proved beyond a reasonable doubt that the defendant engaged in a nearly decade-long bribery conspiracy with McAllen-area attorney Noe Perez ("Perez"). This conspiracy began in late 2008, when the defendant used his position as a sitting Texas District Judge to essentially steal a truck from Perez, which Perez took as an invitation to continue bribing the defendant, which Perez did for the next eight years before the FBI was able to uncover the scheme. In violation of his oaths as an attorney and as an elected District Judge, the defendant repeatedly accepted bribes from Perez in exchange for releasing defendants from custody and performing other official acts.

The recordings made by Perez reveal the true nature of the defendant—someone willing to sell his position, who harbors disdain for the defendants whose rights he swore to protect, and who bears animus for the attorneys and law enforcement professionals in his community. The recordings also revealed that the defendant engaged in his criminal scheme with full knowledge that what he was doing was wrong and in fear that he would fall under investigation by federal law enforcement. When the defendant discovered that he had, in fact, become a target of such an investigation, he immediately and knowingly acted to obstruct justice by sending a false text message to Perez, from whom he knew he had just accepted a bribe. That was the defendant's crime, as proven at trial.

However, at the sentencing stage, this Court should be made aware of and consider all of the defendant's conduct. Accordingly, in Section III below, the government has included other evidence which shows that the defendant's conduct with regard to Perez was not an outlier. As is shown by intercepted calls, witness statements, and documentary evidence, the defendant accepted bribes and improper gifts from attorneys other than Perez.

## II.    CALCULATING THE SENTENCING GUIDELINES

The correct base offense level is 14, pursuant to U.S.S.G. §§ 2C1.1 and 2X1.1. Two levels are added because there was more than one bribe. *Id.* at § 2C1.1(b)(1). An additional six levels are added because the value of the payment, benefit received, or to be received was greater than $40,000 and less than $95,000. *Id.* at § 2B1.1(b)(1)(D). Another four levels are added pursuant to § 2C1.1(b)(3) because the defendant was an elected public official. Finally, two more levels are added pursuant to § 3C1.1 to account for the defendant's obstruction of justice conviction.

| | |
|---|---|
| Base Offense Level<br>§§ 2C1.1 and 2X1.1 | 14 |
| More than one bribe<br>§ 2C1.1(b)(1) | +2 |
| Value of benefit received > $40,000<br>§ 2B1.1(b)(1)(D) | +6 |
| Public Official<br>§ 2C1.1(b)(3) | +4 |
| Obstruction<br>§ 3C1.1 | +2 |
| **Adjusted Offense Level** | **28** |

The Adjusted Offense Level is 28, the defendant's criminal history category is I, resulting in an Advisory Guidelines Range of imprisonment of 78-97 months.

### III. RELEVANT CONDUCT

During the investigation, the FBI collected evidence that suggested that the defendant engaged in a pattern of accepting bribes and improper gifts from attorneys other than Perez. However, the defendant's obstruction of justice prevented the FBI from fully pursuing this evidence. The Guidelines are to be calculated taking into account "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant. U.S.S.G. § 1B1.3(a)(1)(A) (Relevant Conduct). The acts by the defendant need not be proven beyond a reasonable doubt to be considered by the Court; "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." *Id.*, n.1. "Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." *Id.*

"The defendant need not have been convicted of, or even charged with, the other offenses for them to be considered relevant conduct for sentencing purposes." *United States v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009). Uncharged bribes are properly considered as relevant conduct where they are part of a "common scheme or plan as the offense of conviction." *United States v. Barraza*, 655 F.3d 375, 385 (5th Cir. 2011).

The relevant conduct that follows does not have the effect of increasing the guidelines calculation, but it is relevant to the Court's determination of the appropriate sentence in this matter under 18 U.S.C. § 3553(a).[1] The government anticipates that the defendant will argue, as he did at trial, that the conduct for which he was convicted was a result of misunderstandings between himself and Perez, his grief over the death of his son, and other personal issues. To the contrary, the relevant conduct contained herein shows that since early on in his career, the defendant has been giving preferential treatment to friends, violating standards of judicial ethics, and accepting bribes even before he met Perez and in relation to other attorneys. This court should consider this relevant conduct as evidence that the defendant has operated in this manner throughout his career, reject any request for downward departures, and sentence the defendant at the high end of the Guidelines range.

A.   **Apparent Bribes Paid by Attorney 1**

The defendant maintains a close personal relationship with a McAllen-area attorney, Attorney 1. As is demonstrated below, evidence from eye witnesses and from intercepted phone calls show that the defendant has engaged in improper *ex parte* conversations with Attorney 1,

---

[1]   Each of the incidents referred to herein was disclosed to the defendant in pre-trial discovery and was the issue of litigation at trial. *See, e.g.* Dkt. 95, 100, 121.

agreed to do personal favors for Attorney 1 in his capacity as a judge, and suggest that the defendant has accepted bribes from Attorney 1.

    1.    <u>July 2015</u>

During the investigation, the FBI received information from a person, Person 1, who was a close associate of Attorney 1. As a result of this association, Person 1 spent a significant amount of time socializing with Attorney 1, the defendant, and their friends.[2] According to Person 1, he/she learned during that association that Attorney 1 had provided bribes to the defendant for favorable rulings.

As an example, according to Person 1, on a specific day in July 2015, Person 1 attended a surprise birthday party for Attorney 1 at a restaurant in McAllen, Texas, along with several other people, including the defendant. Ex. A at 4.[3] Among the party guests were several women whom Attorney 1, the defendant, and Person 1 knew to be prostitutes. *Id*. One of the prostitutes, Person 2, was then under indictment in the defendant's court for sexual assault of a child. *Id*.

During the party, the prostitutes indicated that they had to leave early because Person 2 was scheduled for a hearing the following day in the defendant's court, which prevented her from staying later and drinking more alcohol. *Id*. Person 1 heard the defendant say that he wanted Person 2 and her friends not to leave the party. *Id*. At that point, Attorney 1 and Delgado discussed the prospect of the defendant dismissing Person 2's case, and the defendant told Person 2 and the other women that he would not be in court the following day, so there was no reason for them to

---

[2] Person 1 cooperated with law enforcement in hopes of obtaining credit against his/her then-pending federal drug charges. Person 1 has since been sentenced and received a reduction in sentence under U.S.S.G. § 5K1.1.

[3] Due to the fact that this sentencing memo and exhibits relate to uncharged individuals and conduct, the government has anonymized the names of individuals other than the defendant and Perez, and filed the exhibits under seal.

leave. *Id*. Moments later, Person 1 observed the defendant use a cellular telephone to call his court coordinator to move Person 2's court date. *Id*. Person 2 then stayed at the party with the defendant, Attorney 1, and the other prostitutes. *Id*.

According to Hidalgo County court records, Person 2 case was set for a hearing in the defendant's court the day after Attorney 1's birthday party. Ex. B. Additionally, these records confirm that Person 2's hearing was moved from that day to the following month, consistent with Person 1's statement. *Id*. The defendant eventually dismissed Person 2's case in March 2016.

Following Attorney 1's party, Person 1 was present at a later meeting between Attorney 1 and the defendant at another restaurant in McAllen, Texas. Ex. A at 5. During the meeting, Person 1 observed Attorney 1 provided the defendant with approximately $1,000 in cash, comprised of several $100 bills. *Id*. Based on the conversations between Attorney 1 and the defendant, which Person 1 was able to overhear, and Person 1's own discussions with Attorney 1 about the incident, Person 1 believes the money was a bribe for the defendant's assistance with Person 2's court case. *Id*.

    2.    <u>June 2017</u>

During the investigation, the FBI obtained an order authorizing interceptions of the defendant's cell phone. Although the government did not introduce any intercepted calls at trial, several interceptions provided potentially productive leads and evidence. However, due to the defendant's obstruction of justice on January 29, 2018, several of those leads could not be fully pursued. One such call involved Attorney 1. Ex. C.

To provide context to the call, in 2010, Attorney 1 had filed a petition for divorce from his wife in the defendant's court. In 2012, the defendant signed the final decree of divorce. Ex. D at 2. On June 22, 2017, nearly five years after the defendant signed the final divorce decree, Attorney

1 filed a petition in the defendant's court to enforce the divorce decree. *Id*. at 1. Two days later, on June 24, 2017, in a phone call that was intercepted by law enforcement, Attorney 1 called the defendant and discussed two of Attorney 1's matters that were then pending—one the divorce motion pending before the defendant and another matter that the two intended to get transferred to the defendant's court. *See* Ex. C. at 4, 7.

At the beginning of the call, Attorney 1 told the defendant that he had been loading hay, leading the defendant to ask whether Attorney 1 needed to purchase hay from the defendant. *Id*. at 2-3. The FBI learned during the investigation that Attorney 1 has purchased hay from the defendant in the past. The conversation echoed the manner in which the defendant brought up the purchase of wood with Perez whenever Perez would pay the defendant a bribe and ask the defendant to do something for him. When the defendant did so, Attorney 1—also like Perez—brought up things that he currently had to spend money on, listing broken appliances in his home. Ex. C at 3-4. A reasonable inference is that Attorney 1, like Perez, was used to the defendant asking for bribes and so was conditioned to suggest to the defendant that he does not have a lot of money to pay the defendant a large bribe.

Attorney 1 and the defendant then talked about a criminal case involving Attorney 1's girlfriend, Person 3, which was then pending before another state District Judge. *Id*. at 4.[4] Attorney 1 and the defendant discussed the possibility of having Person 3's case transferred from the other court to the defendant's court, and the defendant advised Attorney 1 that when making the request for a transfer, Attorney 1 could represent to the other judge that the defendant would accept the transfer if the other judge would grant it. *Id*. at 4-5. Delgado then stated to Attorney 1,

---

[4] The call appears to have been minimized at page 4, line 12 and interception resumed at line 13, causing the unexplained topical break in the conversation.

in reference to the transfer of the case to his court, "so far how that's good news for me, but you can tell me that in person later." *Id*. at 5.  Attorney 1 laughed in response.  The conversation continued in a businesslike manner, with the defendant saying "well, so next item." *Id*.

The two men then discussed the motion that Attorney 1 had filed in his divorce action in the defendant's court. *Id*. at 6.  Attorney 1 explained to the defendant that "there's a glitch with the title policy and the glitch is that somehow what [Person 1's ex-wife],[5] uh . . . not that she didn't give me a quitclaim deed, but they . . . uh, somebody, some idiot put some language about uh . . . I was giving her a judgment in exchange for her not having to pay child support which I never agreed to." *Id*. at 7.  Attorney 1 explained the issue in greater detail and then told the defendant that he had "sued her . . . to enforce the judgment." *Id*. at 9.  However, Attorney 1 informed the defendant that he believed his ex-wife would sign the documents he needed. *Id*. at 9-10.  The defendant responded, "So, now you have her attention.  So, now she's gonna sign." *Id*. at 10. Attorney 1 responded, "She may have signed yesterday at 5:30. I don't know. Either way, I'm gonna play around with her for a little bit for old time sake." *Id*.  A few hours later, FBI Agents surveilled the defendant drive to Attorney 1's house.

Five days later, on June 29, the defendant called his court coordinator to discuss several scheduling issues in another intercepted call. Ex. E.  During the conversation, the court coordinator said that on a "comical note," Attorney 1 had filed for a modification of the medical support for his ex-wife, and asked the defendant when he wanted the motion set. *Id*.  The defendant said that he did not want to set the motion for a hearing, and instructed his court coordinator to "ignore it" instead. *Id*.  Court records show that no hearing was ever held on the motion. Ex. D at 1.

---

[5]    Attorney 1 initially referred to his ex-wife by her first name, and then corrected himself to refer to her by her initials, which is how she was identified in the caption for the divorce action. *See* Ex. C at 7, Ex. D at 1.

In the intercepted call with Attorney 1, the defendant agreed to take two official actions to benefit Attorney 1: accepting the transfer of his girlfriend's case to the defendant's court and not taking action on Attorney 1's motion in his divorce case so that Attorney 1 could hold the motion over his ex-wife's head until she agreed to sign the documents he wanted. The defendant's intercepted call with his court coordinator confirmed that the defendant did what Attorney 1 wanted: he did not set the motion for a hearing so that Attorney 1 could toy with his ex-wife, to "play around with her for a little bit for old time sake." The defendant's statement to Attorney 1 that he "fails to see" how it would benefit him, coupled with the surveillance showing the defendant traveling to the defendant's home later that day, and the witness statements that Attorney 1 has paid the defendant other bribes suggests that this situation involved another bribe paid by Attorney 1 to the defendant.

### B. Apparent Bribe Paid by Attorney 2

On June 23, 2017, the FBI intercepted a call between the defendant and McAllen-area attorney, Attorney 2, wherein the two discussed Attorney 2 purchasing hay from the defendant, just as the defendant had discussed with Attorney 1. Ex. F at 2. Attorney 2 told the defendant that he would pay for the hay and pick it up later, which is consistent with Perez's testimony that he would pay the defendant bribe money under the guise that he was buying firewood but never pick up the wood. *Id*. Three days later, after 8:00 p.m., Attorney 2 called the defendant and asked if he had time for a drink. *Id*. at 5. The defendant indicated that he did and suggested that Attorney 2 should come to the defendant's house. *Id*. Attorney 2 agreed to do so, but warned the judge that he was not in his "crisp white starched shirt." *Id.* The defendant replied, "well, you know what you need to do. You're an attorney. Be fucking analytical." *Id.* Later, Attorney 2 asked the defendant what he wanted to drink, "[w]hat is it? Uh, same thing?" *Id.* The defendant then said

9

"bring me some Coronas, as that'll bring out the Mexican." *Id*. Attorney 2 agreed to do so, and the call ended.

Surveillance video from a nearby convenience store showed Attorney 2 entering the store and purchasing a 12-pack of Corona beer before getting back in his vehicle. Ex. G. Shortly thereafter, video from a pole camera with a view of the driveway at the defendant's residence showed a black Ford F-150 arriving at the defendant's residence shortly after 8:30 p.m. *Id*. Video from the pole camera also revealed the black Ford F-150 leaving the defendant's residence at approximately an hour later. *Id*. Although imagery from the pole camera was not sufficient to obtain license plate information, records obtained from the Texas Department of Motor Vehicles show that at that time, Attorney 2 owned a 2005 black Ford F-150. Pursuant to data received from a court-authorized GPS tracker issued for the defendant's cell phone, the defendant's cell phone was in the vicinity of the defendant's residence between 8:30 p.m. and 9:30 p.m.

The next day, June 27, 2017, Attorney 2 filed a notice of appearance in a case assigned to the defendant's court. Ex. H. Court records indicate that on June 27, Attorney 2's client was arraigned and her pretrial hearing was set for July 25, 2017. Ex. I.

On July 25, 2017, Attorney 2 appeared on behalf of his client, who was given pretrial diversion by the defendant. *Id*. at 1-2. Shortly after the hearing, at approximately 1:14 pm the same day, the FBI intercepted a call between Attorney 2 the defendant wherein the two engaged in an *ex parte* conversation regarding the hearing they had just held for Attorney 2's client. Ex. F at 6.

The FBI was unable to pursue fully the nature of the interactions between the defendant and Attorney 2 were hampered by the defendant's January 29, 2018 text message. Due to the fact that the text message necessitated the FBI making the investigation overt and arresting the

defendant, the FBI was unable to interview Attorney 2 before he was aware of the investigation into the defendant. Furthermore, shortly after his arrest, the defendant called Attorney 2 to advise him to pick up the hay he had yet to pick up. When the FBI was finally able to interview Attorney 2, Attorney 2 falsely denied ever bringing beer to the defendant and denied ever having *ex parte* conversations with the defendant.

As with the intercepted calls with Attorney 1, these intercepted calls with Attorney 2 suggest that the defendant accepted a bribe from Attorney 2. The interaction was nearly identical to how the defendant solicited and accepted bribes from Perez: Attorney 2 called the defendant after hours and asked to visit him at home; the defendant asked Attorney 2 to buy him beer by saying he felt "Mexican"; Attorney 2 made a brief visit to the defendant's home; the next day Attorney 2 entered his appearance in a case before the defendant; and Attorney 2's client ended up with a beneficial outcome.

Further, the Attorney 2's comment that he was not in his "crisp white starched shirt" and the defendant's response: "well, you know what you need to do. You're an attorney. Be fucking analytical," shows that the defendant and Attorney 2 know that Attorney 2 is coming to see the defendant about a case pending before him. The next part of the exchange is the defendant telling Attorney 2 what kind of beer he wanted. This exactly mirrors the defendant's bribery relationship with Perez, and strongly suggests that Attorney 2 had a similar bribery relationship.

### C.   Alleged Bribes Paid by Attorney 3

The FBI also interviewed a cooperating defendant, Person 4,[6] who stated that on two occasions in approximately 2004, he paid cash bribes to the defendant on behalf of a McAllen-

---

[6]   Person 4 had previously been convicted of drug trafficking in an unrelated case and was serving a sentence of incarceration. He provided this information to the government in hopes of receiving additional credit for cooperation, but no such promises were made to Person 4.

area civil attorney, Attorney 3. Ex. J. On both occasions, Attorney 3 asked Person 4 to deliver to Delgado envelopes that Person 4 believed to be filled with cash. Person 4 believed that the envelopes contained cash because in his previous experience as a drug trafficker, he often paid people large sums of money in cash in envelopes. Person 4 made these deliveries to the defendant at his home, in the evenings. Attorney 3 told Person 4 that he made payments to the defendant because the defendant helped Attorney 3 with cases the attorney had pending in the defendant's court. Hidalgo County court records confirm that Attorney 3 had several cases before the defendant during the relevant time frame.

When interviewed by the FBI, Attorney 3 admitted knowing the defendant and Person 4, and confirmed other details provided by Person 4, but denied paying bribes to the defendant.

### D.   Undisclosed Improper Gifts from Attorney 4 and Attorney 5.

The defendant also accepted improper gifts from attorneys appearing before him, and did not disclose any of them as required by state law. Attorney 4, a McAllen-area attorney who is also a close personal friend of the defendant, stated in interviews with the FBI that he and another attorney gave gifts to the defendant while they had high-dollar products liability cases pending before him. None of these gifts were disclosed on the defendant's legally-required personal financial statements.

In 2013, the defendant had a high-dollar products liability suit pending in his case. Ex. K at 2-3; Ex. L. The case was filed in early 2013 and resolved by a mutually-agreed settlement in mid-2014. Ex. L at 1. The plaintiffs were represented by, among others, Attorney 4 and Attorney 5, a Texas attorney. In December 2013, while that case was pending, Attorney 4 and Attorney 5 took the defendant to an all-expenses-paid hunting trip at a ranch owned by Attorney 5, which provides the ability to hunt trophy bucks valued over $20,000 and offers gourmet meals and fine

accommodations. Ex. K at 3; Ex. M. This was the second time Attorney 4 and Attorney 5 had hosted the defendant at the ranch; they did so in 2012 when they had also cases pending before the defendant. *Id*. at 3. During that trip, the defendant had discussed with Attorney 5 the possibility of Attorney 5 purchasing firewood from the defendant for use at Attorney 4's ranch. Ex. K at 3.

The parties in the 2013 case filed a notice of non-suit in early May 2014, notifying the defendant that the parties had come to a negotiated resolution of the case. Ex. L. On May 21, 2014, the defendant signed an order dismissing the case. *Id*. That same day, Attorney 4 purchased an airplane ticket for the defendant, himself, and another friend to fly to Miami, Florida the following week. Ex. N. The men then spent three days in Key West, Florida at a residence provided by Attorney 5. Ex. K at 1. The expenses for the trip, which were over $4,000, were paid by Attorney 4, who was reimbursed by Attorney 5's law firm. Ex. O. The defendant did not pay any of the expenses. Ex. K at 1.

Texas Government Code, § 572.021 requires that every state officer must file a financial statement. This statement must include, among other things, each "person or other organization from which the individual . . . received a gift of anything of value in excess of $250 and a description of each gift." *Id*. at § 572.023. The only exceptions to this required disclosure are gifts from close relatives, political contributions which are otherwise reported, and otherwise reported lobbyist expenditures. The defendant did not disclose these gifts, both of which were worth much more than $250, on his personal financial statements for either 2013 or 2014. Ex. P at 7; Ex. Q at 3.

One reason the defendant may have failed to disclose these gifts is that he knew they were prohibited by the Canons of Judicial Conduct. Canon 2(A) states that "A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and

impartiality of the judiciary." Canon 4(D)(4)(c) instructs that judges may only accept gifts from others if "the donor is not a party or person whose interests have come or are likely to come before the judge." Clearly, disclosing that he received these gifts from litigants before him would have raised significant questions about the defendant's impartiality.

**IV.      THE SECTION 3553(A) FACTORS**

It is well-established that a court must consider a variety of factors in imposing a sentence on a criminal defendant, beginning with the applicable range established by the Guidelines. *See* 18 U.S.C. § 3553; *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (noting that guidelines ranges "serve as one factor among several courts must consider"). Although the Guidelines are advisory in nature, courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (noting that a sentencing court "must first calculate the Guidelines range").

The court then must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), including (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant; (3) the kinds of sentences available; (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). Applying these factors to this case, a total sentence of 97 months is the appropriate resolution of this case.

**A.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)).**

First and foremost, this Court should consider that during the entire ten-year period that the defendant was accepting bribes from Perez, he was a Texas attorney and elected judge who had taken oaths to uphold the law. As a Texas attorney, the defendant took an oath to support the Constitutions of the United States and of Texas, to "honestly demean [himself] in the practice of law" and to conduct himself with "integrity and civility." As a judge, the defendant took an oath to "faithfully execute the duties" of the office of District Judge and to "preserve, protect, and defend the Constitution and laws of the United States" and of Texas. He took this oath five times—once each time he was elected. In his position, the defendant wielded tremendous power—power over the attorneys before him, power over civil litigants, and the awesome power to deprive criminal defendants of their liberty. As a trial judge, his power was magnified by the fact that his decisions, if even subjected to appellate review, were most often given the utmost deference. The defendant violated his oaths and used his power to enrich himself.

To evaluate the nature and circumstances of the offenses of conviction, this Court must consider the fact that, after taking oaths as an attorney and as a Judge and after being admonished that behavior which pales in comparison to his offense violates the code of judicial conduct and the Texas Constitution,[7] the defendant brazenly *stole* a truck from an attorney who practiced before him.[8] This act was a truly galling abuse of power. The defendant knew that he had tremendous

---

[7]     As this Court is aware from the pretrial motions, the defendant was publicly admonished by the Judicial Commission in 2000 because he had "participated in an improper *ex parte* communication in violation of Canon 3B(8) of the Texas Code of Judicial Conduct and engaged in willful or persistent conduct that is clearly inconsistent with the proper performance of his duties in violation of Article V, Section 1-a(6)A of the Texas Constitution." Ex. S.

[8]     To the extent that the defendant argues that the defendant purchased the truck in a legitimate transaction, and did not steal it, it should be considered that the owner of the car dealership where the truck was allegedly sold admitted to the FBI that he was not paid $11,000 for

power over Perez, who said he felt "backed into a corner." Day 3 at 57.  This is precisely why the defendant chose Perez—not only was he an attorney who appeared the defendant's court, but Perez needed the criminal appointments that the defendant controlled.  Perez was a new lawyer who was trying to establish his business; without appointments from judges such as the defendant, Perez likely could not earn a living.  That is why the defendant preyed on him.

The defendant argues in his objections as he did to the jury, and undoubtedly will in his own sentencing memorandum, that the truck incident was a legitimate transaction.  Setting aside that the jury heard that argument and rejected it, the defendant's own words, which provided some of the most powerful evidence of his guilt, also show that the defendant knew full well that what he was doing with Perez was wrong.  On each of the first three recordings—December 2016, August 2017, and November 2017—the defendant makes some sort of reference to keeping people from asking questions or to keeping from being detected.  He knew that what he was doing was improper and illegal from the very beginning.

The August 2017 recording shows that the defendant was not only fully aware of the criminality of his actions but also his disdain for the criminal justice system.  Once Perez told the defendant about his "client," the defendant's first thought was not only that the client was a federal cooperator, but one intended to investigate him.  The defendant went on a prolonged and profane tirade, coming up with varied derogatory terms for a cooperator: a skunk, a croaker, a booby trap. Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 49.  The defendant was clearly afraid of the client, alluding

---

the truck, as the forged documents show. *See* Ex. R.  The owner of the dealership—a close friend of the defendant—was interviewed by the FBI shortly after the defendant's arrest and admitted the documents were false.  *Id.*  He explained that the defendant brought the truck to his dealership and said he wanted to sell the truck on consignment, but that a week later, the defendant came back and said that he wanted to give the truck to his son, Ricco.  *Id*. at 9-10.  There would be no reason to fabricate documents, as the defendant had the dealership owner do, if the underlying transaction was legitimate.

16

to the robot from Lost in Space who warned of danger. Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 42. He did this because he believed that a federal cooperator was being sent into the state judicial system to investigate him:

> No, no, no, no you're talking about slam dunk fucking cases that they're rejecting and that's 'cause they want to see what I'm doing and what Rick Rod's doing and what we're doing.

Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 48. The defendant's words are clear—he knows what he and Perez are doing is illegal.

During his tirade, the defendant revealed his true feelings about the criminal justice system, graphically explaining how he viewed cooperators, a staple of the criminal justice system:

> No, that ain't no fucking reality. The reality is, . . . motherfucker, here's what we're gonna do. We got this hook on your ass, and we're gonna send you swimming up river and understand when we tag your fucking ass you better make like a fucking croaker and croak. . . . And, and, and don't be telling us that you went into some fucking catfish hole and you didn't, hid, you didn't feel our tug because . . . it got tied up on some kind of log that was kinda floating down the fucking river, motherfucker. We pull, and we tug, you . . . .you fucking croak.

Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 49.

Further demonstrating that the defendant knew what he was doing was wrong, he told Perez not to text him when contacting him about the client—"Well, no, no, no we don't want to do that." Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 43-44. Instead, the defendant used his judicial staff—all state employees—to cover his criminal activities, telling Perez to call his chambers and speak to his assistant about the client because "that's just, that's just regular lawyer-like business." Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 44. Later, the defendant again told Perez that Perez asking the defendant's assistant to remind the defendant about the case was "better than you sending me a text." Gov. Ex. 16; *see* Ex. F to Dkt. 142 at 47.

The January bribe, when viewed in context, lays bare the defendant's scheme. Larger bribes buy better judicial service. Perez immediately told the defendant that he had $5,500 for him, and this time, the defendant does not ask any questions about the offense; there is no pontificating, there is no lengthy discussion of the things he could or could not do. The defendant simply pulls out his calendar to figure out how quickly he can perform the task Perez had just paid for, knowing nothing about the criminal defendant he has just agreed to release. The next day, the defendant released the defendant without even bringing him to court, bearing striking resemblance to the 1999 incident for which the defendant received an official admonishment from the Judicial Commission—showing that not only had the defendant not learned anything in the 18 years since his admonishment—he had gotten worse.

In weighing both the defendant as an individual and the nature and circumstances of his offense, this Court should weigh heavily the relevant conduct, as it shows that the interactions with Perez were not a one-off—this is how the defendant conducts himself. There is evidence that strongly suggests that the defendant accepted bribes from other attorneys; that this was a pattern of behavior, beginning as early as 2004. Even if the evidence does not prove other bribes, it does show that the defendant routinely engages in ex parte conversations, accepts improper gifts, and shows favoritism to his friends over other attorneys. These facts weigh in favor of a long prison sentence, at the high end of the Guidelines, and against any downward departures or other mitigation that the defendant may provide.

**B.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A)) The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B)).**

A substantial prison sentence is essential to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense. § 3553(a)(2)(A). Not

only must other public officials know that offensive abuses of their power such as this will be met with severe consequences, but also the public must be reassured that the law applies equally—even to those in power.  Crimes such as those committed by the defendant shake the confidence of the public when made public and laid bare for all to see.  However, they have a more deleterious effect when they become the status quo for the judicial system; people who recognize the corruption of a judge such as the defendant but see that there is no enforcement lose faith in the entire system of law.  They begin to believe that "this is just how it is," and that the law is not for them—it is for people with money, with access.  This is antithetical to the founding principles of justice and of our country, and it cannot stand.

Anything other than a substantial sentence will send the message to the public that judges receive preferential treatment.  This Court must punish the defendant for his willful and pervasive criminal conduct and send a strong and unequivocal message to other public officials in McAllen and around the country that with great power comes great responsibility and abuse of the privileges of power will not be tolerated.

### III. CONCLUSION

For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the advisory guidelines range—97 months.

DATED: September 20, 2019

Respectfully submitted,

RYAN PATRICK
United States Attorney

JOHN D. KELLER
ACTING CHIEF
PUBLIC INTEGRITY SECTION

_____/s/_____
Arthur R. Jones
Assistant United States Attorney
Southern District of Texas

_____/s/_____
Peter M. Nothstein
Trial Attorney
Public Integrity Section

(Houston Division)
Direct Line: (713) 567-9357
Email: Arthur.Jones@usdoj.gov

Criminal Division
Direct Line: (202) 616-2401
Email: Peter.Nothstein@usdoj.gov

Robert Guerra
Assistant United States Attorney
Southern District of Texas
(McAllen Division)
Direct Line: (956) 992-9354
Email: Robert.Guerra@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, a copy of the foregoing pleading was filed electronically with the Clerk of the Court using the CM/ECF system, and an electronic copy of such filing was sent to the attorneys of record for the defendant via email.

Dated: September 20, 2019

/s/
Arthur R. Jones
Assistant United States Attorney
Southern District of Texas
(Houston Division)
Direct Line: (713) 567-9357
Email: Arthur.Jones@usdoj.gov

/s/
Peter M. Nothstein
Trial Attorney
Public Integrity Section
Criminal Division
Direct Line: (202) 616-2401
Email: Peter.Nothstein@usdoj.gov

Robert Guerra
Assistant United States Attorney
Southern District of Texas
(McAllen Division)
Direct Line: (956) 992-9354
Email: Robert.Guerra@usdoj.gov