UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 18-CR-00115 |
| | § | |
| RODOLFO "RUDY" DELGADO, | § | |
| DEFENDANT | § | |

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

TO THE HONORABLE JUDGE OF THE SOUTHERN DISTRICT OF TEXAS:

NOW COMES, Defendant Rodolfo Delgado, by and through his undersigned attorney, and, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) as amended by the First Step Act of 2018, § 603(b)(1), Pub. L. 115-391, 132 Stat. 5194, 5239 (2018) and United States Sentencing Guidelines § 1B1.13, requests that this Court grant him immediate compassionate release from FMC Fort Worth, and reform his judgment to a time-served sentence or home detention for a specified time period.

### I.      Procedural History.

On October 1, 2019, judgment was entered reflecting that Mr. Delgado was sentenced to serve a sentence of imprisonment of 60 months.[1] Because of his fragile medical condition, the Bureau of Prisons designated Mr. Delgado to the Bureau of Prisons' Federal Medical Center prison facility in Fort Worth, Texas. Mr. Delgado reported to FMC Fort Worth on November 19, 2019, as instructed. He has been fully compliant with all restrictions and conditions imposed upon him by prison officials.

### II.     Mr. Delgado's Personal Situation.

As this Court was made aware prior to sentencing, Mr. Delgado suffers from the following:

- He is a diabetic, having been diagnosed as suffering from hyperglycemia. PSR ¶ 67.
- He is immunocompromised and is prescribed Sirolimus (an immunosuppressant).

---

[1] He was sentenced to 48 months on several counts, and 60 months on others, all to run concurrently.

1

- He is diagnosed as suffering from hypertension . PSR ¶ 67.
- He is diagnosed as suffering from hypercholesteremia, a heart condition.  PSR ¶ 67.
- He underwent a liver transplant in 2010 and takes daily and b-weekly medication. PSR ¶ 66.

Prior to his conviction, Mr. Delgado was licensed to practice law in the State of Texas and was elected numerous times to serve as a judge. As a result of his conviction, Mr. Delgado voluntarily agreed that his license to practice law would be suspended and resigned from his elected position as judge.

## III.    The Current Coronavirus Situation in Prison.

### A. The General Population of Prisoners.

The COVID-19 virus has not been sympathetic to those whose life in prison does not lend itself to social distancing. We have learned that the coronavirus is a particular threat to prison populations because of the circumstances of confinement and the inmates' close proximity to each other. *See* U.S. Congressional Research Service, Federal Prisoners and COVID-19: Background and Authorities to Grant Release, Rpt. No. R46297, April 2, 2020, https://crsreports.congress.gov; https://www.businessinsider.com/trump-consider-coronavirus-executive-order-federal-prisons2020-3. On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which addressed many issues including incarceration. Under the CARES Act, the U.S. Attorney General and the Director of the Bureau of Prisons were given broader authority to release inmates to home confinement. The Bureau of Prisons has announced that two dozen federal inmates have died of COVID-19 since March 2020, and more than 600 inmates and 350 staffers have tested positive for the virus. On March 26, 2020, the AG issued a memorandum to the BOP Director calling on BOP to grant home confinement to inmates who (a) are at-risk because of health problems, (b) were convicted of non-violent offenses, and (c) pose minimal likelihood of recidivism. He followed that up a week later by issuing a memorandum on April

3, directing the BOP to prioritize those prisoners who reside in facilities that are most affected by COVID-19. In essence, AG Barr recognized that some inmates may be safer at home than in BOP facilities. More than 1,500 prisoners have been sent home early.

**B. Prisoners with Health Issues are a Higher Risk to Suffer More Severe Consequences.**

Masks and social distancing efforts address the issue of whether someone will contract the virus. But this is not the only issue. Those prisoners who suffer from different diseases are particularly susceptible ***suffering more severe consequences*** of the virus. The Centers for Disease Control and Prevention ("CDC") recognized that "older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19." *See* Centers for Disease Control and Prevention, <u>People Who Are at Higher Risk for Severe Illness</u>, April 25, 2020, attached hereto as Exhibit A.  The CDC designated nine factors, any one of which would pose a "high-risk for severe illness from COVID-19":

1. People 65 years and older;
2. People living in a nursing home or long-term care facility;
3. People with chronic lung disease or moderate to severe asthma;
4. People who have serious heart conditions;
5. People who are immunocompromised, including those who are receiving or have received cancer treatment, organ transplantation, or possess immune deficiencies;
6. People with severe obesity;
7. People with diabetes;
8. People with chronic kidney disease undergoing dialysis; and,
9. People with liver disease.

*See* Exhibit A.

Several of these are worthy of examination, as they directly relate to Mr. Delgado's situation.

*1. Diabetes & Hypertension.*

Persons who are elderly, and who also suffer from hyperglycemia and hypertension are more vulnerable than the average person. *See* International Diabetes Federation, Diabetes Research and

Clinical Practice, <u>Timely Blood Glucose Management for the Outbreak of 2019 Novel Coronavirus Disease is Urgently Needed</u>, Vol. 162, # 108118, April 1, 2020, attached hereto as Exhibit B.

> Due to compromised innate immune response, diabetic patients exist increased susceptibility and enhanced disease severity following SARS-CoV-2 infection. In addition, COVID-19 with diabetes ***has much more potential to progress rapidly*** with acute respiratory distress syndrome and septic shock, which may be eventually followed by multiple organ failure.

*Id.* (emphasis added)*; see also* Centers for Disease Control and Prevention, <u>Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 - United States, February 12 - March 28, 2020</u>, April 3, 2020, attached hereto as Exhibit C ("Based on preliminary U.S. data, persons with underlying health conditions such as diabetes mellitus, chronic lung disease, and cardiovascular disease, appear to be at ***higher risk for severe COVID-19-associated disease*** than persons without these conditions.").

   *2. Long-Term Liver Transplant Patients.*

   Due to the recency of the COVID-19 pandemic, there is not yet substantial data relative to those persons who are long-term liver transplant patients. However, there does appear to be an indication that these persons are particularly susceptible to suffering rapid and severe degeneration of their health at the onset of the virus. *See* The Lancet, Gastroenterology & Hepatology, <u>COVID-19 in Long-Term Liver Transplant Patients: Preliminary Experience from an Italian Transplant Centre in Lombardy</u>, April 9, 2020, DOI: https://doi.org/10.1016/S2468-1253(20)30116-3, attached hereto as Exhibit D. An analysis was conducted of three long-term liver transplant patients, each of which were older than 65 years, receiving antihypertensive drugs, and suffering also from diabetes. *Id.* All three died very soon after being admitted to a hospital, rapidly developing severe respiratory distress syndrome.

   Just days ago, the British Liver Trust in England published a notice on the internet that persons who received a liver transplant are at "a very high risk of severe illness from COVID-19" and are

4

instructed to remain no closer than 6 feet from any other person and to not go outside for any reason. *See* British Liver Trust, Coronavirus - Health Advice for People with Liver Disease and Liver Transplant Patients, April 21, 2020, attached hereto as Exhibit E.

*3. Hypercholesterolemia.*

The CDC published that "[b]ased on currently available information and clinical expertise, people who have serious heart disease are among those ***more likely to have severe illness from COVID-19***." *See* Centers for Disease Control and Prevention, Familial Hypercholesterolemia, March 20, 2020 (emphasis added), attached hereto as Exhibit F. On its website, the CDC recommends that persons with this diagnosis remain 6 feet away from others, "keep away from people who are sick," and "stay home if possible." *See* Centers for Disease Control and Prevention, What You Can Do, April 3, 2020, attached hereto as Exhibit G (this article was accessed via a link incorporated into the page "Familial Hypercholesterolemia", attached as Exhibit F, where it states "Click here to learn steps you can take to help protect yourself, especially if you are at higher risk of severe illness from COVID-19.").

IV.     **Mr. Delgado's Situation.**

A.  **BOP's Treatment of Mr. Delgado's Health Problems.**

As noted above, Mr. Delgado suffers from hyperglycemia, hypertension, hypercholesteremia, and needs ongoing treatment for issues associated with his liver transplant. He reported to FMC Fort Worth in November 2019, over five months ago. In the FCM Fort Worth facility, prison personnel schedules all medical appointments and procedures; a prisoner literally has no control over whether he is examined by a physician or other medical personnel. Mr. Delgado has had three visits with a physician:

1. Mr. Delgado visited with a general practice physician only once since he arrived in November. The prison has not scheduled Mr. Delgado for another visit with the physician.

5

2. On one occasion, Mr. Delgado was seen by a gastroenterologist to monitor Mr. Delgado's liver situation. Although the gastroenterologist ordered an endoscopy and colonoscopy months ago, Mr. Delgado has yet to be taken to the hospital for the procedures. He learned that the procedures carry substantial risks given his medical history. He has not been told when, or if, he will be taken to the hospital, and no follow-up examination has been scheduled by the gastroenterologist or other prison official. He has not seen this doctor again.

3. Mr. Delgado was also seen by a cardiologist as a result of his hypercholesteremia and other issues. The doctor did not adjust any medications, and no follow-up meetings have been scheduled by the doctor.

Mr. Delgado was told by physicians prior to entering prison that it is very important that he receive a full checkup of his liver condition every 10 years. His checkup is now due, as he underwent the liver transplant ten years ago. Mr. Delgado sought three (possibly four) times to provide prison medical personnel his Transplant Clinic Orders, which document his transplant physician's orders that Mr. Delgado should receive a lab test (AFP Tumor Marker) and an ultrasound of the liver as soon as possible. Each of these three times, no action was taken by the prison employee personnel (non-physicians), as they each indicated they did not know what action they were supposed to take. Finally, on April 2, 2020, Mr. Delgado was able to convince one non-physician employee to take the Orders and make a copy. Almost four weeks have gone by, and Mr. Delgado still has not been provided the opportunity to discuss these Orders or the required tests with his general physician or any other physician. Nor will anyone tell him when he can see these doctors or whether they are going to give him these needed examinations. He receives a daily temperature check for fever, but there are no other COVID-19 examinations or testing being conducted on him (or others insofar as he knows).

### B.  Mr. Delgado Suffers Almost All of the High-Risk Factors.

Mr. Delgado is burdened with suffering not only one or two of the high-risk factors

identified by the CDC and other medical professionals, but virtually all of them:

| High-Risk COVID-19 Factors identified by CDC and Diabetes and Liver Disease Experts | Mr. Delgado |
| --- | --- |
| | |
| 1. People 65 years or older | 67 years old |
| 2. People living in a nursing home or long-term care facility | He is living in a long-term medical care facility |
| 3. People who are immunocompromised, including those who have received an organ transplant | He received an organ transplant in January 2010 and is taking immunosuppressed medication (PSR ¶ 66) |
| 4. People with diabetes & hypertension | He is diagnosed with hyperglycemia & hypertension (PSR ¶ 67) |
| 5. Long-term liver transplant patient | He received a liver transplant in 2010. |
| 6. People with hypercholesterolemia, a severe heart disease | He is diagnosed with hypercholesterolemia (PSR ¶ 67) |

### C.  Mr. Delgado's Current Living Conditions.

Burdened with so many high-risk factors, one would think that special attention would have

to be paid to Mr. Delgado to protect him from contracting COVID-19. Unfortunately, not so. He

was assigned to a 2-man cell with a 79-year-old cellmate who suffers from leukemia. Due to the small

size of the cell, Mr. Delgado's bunk has to touch his cellmate's bunk. All inmates on the first floor of

his area have disabilities and illnesses; some require wheelchairs, walkers or otherwise are unable to

climb stairs. As noted above, Mr. Delgado lives in a long-term medical care facility. The second floor

of the unit where Mr. Delgado's cell is situated has one large room where over 100 inmates gather.

Inmates are free to go to/from the first and second floor. There are approximately 250 inmates in the

unit. Social distancing in this close-confined area as well as inside his individual cell is impossible.

There is only one entrance/exit to the one large room where inmates are allowed to access. This

doorway leads to a central hallway which is the only way to access Mr. Delgado and others' cells.

All inmates, including those on wheelchairs and walkers, line up on both sides of the narrow hallway each day to receive their mail. They are instructed to squeeze in next to each other in order to have room for everyone to line up. They then are called to walk one-by-one to the end of the hallway between the two lines of men when their name is called in order to retrieve their mail. They walk back to their place in line between the lines of men and wait to walk up again as many times as their name is called (the pile of mail is not segregated by name when being called out). This procedure takes some time given the number of prisoners.

When it is time to eat, the inmates are again instructed to line up on both sides of the hallway, each one closely behind the man in front of him, and close to the men on the other side of the narrow hallway. The men walk slowly in line downstairs to receive their meal. Once the meal is given to an inmate, the inmate turns and climbs back up the stairs in between the lines of men walking slowly downstairs on each side of the hallway. Again, no social distancing is possible.

Their sinks are immediately next to each other in the group restroom. The urinals are close enough so that one's face is 18 inches from the other man's face next to him. In the computer room, computers are situated next to each other, less than 2 feet apart, and are continuously used by prisoners to access email, communicate with staff counselors and case managers, receive bulletins issued by the BOP, and access the commissary account. Computer keyboards are never cleaned, though used by all. There are no sanitizers in the rooms nor gloves.

Telephones are located on the floor of the unit, and also are continuously used by inmates to contact family, lawyers and others. Visitation to all BOP facilities was terminated upon the onset of COVID-19 and policy was changed to allow up to 500 minutes of free calls per month. Because of this, telephone use increased dramatically. Again, the phones are never cleaned, inmates are not using masks when talking on the phones, there are no sanitizers close by, and there is no washing of hands prior to each prisoner's use of the phone.

Once each week, inmates again are told to line up on both sides of the hallway and to bring their towels, washcloths, bed linen and pillowcase. The men in the two lines in the hallway are told to walk in a line downstairs, and then place his soiled items in large bins, one-by-one. The bins accommodate several hundred articles of items. Each inmate is then given a laundered exchange of whatever item was placed in the bins. The line keeps moving, each man close to the man in front of him, until they return to their cells upstairs. Again, there is no social distancing, and coughing and sneezing by anyone so afflicted must be borne by others during all walks of this nature. The inmates are not allowed to know the procedure for washing and stacking the clean items, other than they are washed in a large machine to accommodate everyone's items.

This procedure is repeated for clothing, but on another day. When an inmate receives a new pillowcase or towel, it is undoubtedly that of a different prisoner's dirty laundry from days before. Thus, the inmates are forced to rely on those who wash the items to ensure that any potential virus is eliminated from the cleaning process.

Given that this is a medical facility, coughing and sneezing and other bodily functions are common. Masks have been issued to each prisoner, but most often are not worn by many of the prisoners, particularly the younger ones, and prison officials do not mandate that they be worn, except for certain isolated instances. Men walk around in close proximity to each other without masks. Masks are washed as well, but an inmate is not returned the mask that he has been wearing; he is given a mask that was worn by another prisoner and told that it was washed. Inmates were told that they are not allowed to wash their own masks.

But again, the issue is not only whether Mr. Delgado will contract the virus, but the extent to which he will experience a rapid, severe reaction which could lead to death given his medical condition.

9

### D.  COVID-19 Infections in the FMC Fort Worth Prison Facility.

Several days ago, a prisoner housed in the same prison facility as Mr. Delgado died. Arnoldo Almeida, 61 years old, tested positive for COVID-19 on April 13, 2020, and was placed in isolation. Although he was placed on a ventilator this past Saturday, he died less than 10 days after the prison realized he was infected. *See* NBCDFW News, <u>Inmate Dies of Coronavirus Amid Outbreak at Fort Worth Federal Prison Where "Tiger King" is Held</u>, April 22, 2020, attached hereto as Exhibit H. There is no indication from whom inside Mr. Delgado's unit Mr. Almeida contracted the virus.

In the past two days, Mr. Delgado and others in his unit saw three inmates taken away by gurney to an ambulance. The crew taking them all were wearing protective gear and the patients looked in severe distress.

The BOP's website indicates that ***two hundred seventeen (217) inmates*** at FMC Fort Worth have tested positive for COVID-19. *See* Federal Bureau of Prisons, <u>COVID-19 Coronavirus</u>, printed April 26, 2020, attached hereto as Exhibit I.  In fact, FMC Fort Worth is the ***highest ranked prison facility in the country*** for the number of inmates affected. Remarkably, BOP indicates that the prisoners at FMC Fort Worth have experienced ***three times as many positive infections as any other prison facility*** in the United States. *Id.,* p. 2; *see also* USA Today, <u>Federal Prison System Expands Virus Testing to Find Hidden Asymptomatic Infections</u>, Kevin Johnson, April 23, 2020, attached hereto as Exhibit J (FMC Fort Worth ranks among the highest in number of infections).

 One staff member at FMC Fort Worth has tested positive, and two inmates have died at this facility. *Id.* Employees at this particular prison facility realize the risk is very real:  The leader of the prison employees' union said employees are taking off their work clothes outside their homes and disinfecting them to avoid contaminating their families. The union leader expressed that the "big concern right now is I don't believe we've peaked yet. We have a lot of elderly inmates with underlying health issues." *See* Exhibit H.

Perhaps the most glaring example of the precarious and dangerous situation that Mr. Delgado faces is the photograph depicted in the NBCDFW article, attached as Exhibit H.



Federal prison correctional officer Gregory Watts shows the protective gear employees at Federal Medical Center Fort Worth are wearing.

The situation at FMC Fort Worth is so dire that prison officials wear protective gear, protecting their hands and body. Unfortunately, the same benefit is not given to the inmates in FMC Fort Worth who have to stand next to each other, and sleep and eat and breathe and cough within two feet of each other on a 24-hour basis.

### E. Mr. Delgado's Administrative Request.

Upon realizing that his age and physical maladies place him in the upper level of risk for severe consequences of COVID-19, plus the fact that his proximity to other sick prisoners without adequate protection leave him in an extremely vulnerable place, Mr. Delgado presented an administrative request for compassionate release. On April 1, Mr. Delgado met with his case manager, Mr. Brown, and requested a release to home confinement. Mr. Brown asked that Mr. Delgado return to see him on April 3.  On April 3rd, Mr. Delgado hand delivered a completed form (Form FTW 1330.13,

commonly referred to as "BP 8") requesting transfer to home confinement, with attachments, to his case manager Mr. Brown and his Unit Manager Mr. Gutierrez. He had obtained the administrative form from his counselor, Mr. Cruz. Mr. Delgado spoke to three prison officials about his unique vulnerability, even among others who are sick, and his request for transfer to home confinement.

Seven days went by and he received no response. On April 10, he wrote an email to his case manager Mr. Brown, detailing again his request for transfer to home confinement. In the email, he provided more information to demonstrate about his medical history that matched closely the criteria set out by Attorney General Barr in his directive. On April 11, Mr. Delgado's unit officer gave him BOP's written response which indicated on its face that it had been signed on April 6 by the Unit Manager Mr. Gutierrez. The response stated that Mr. Delgado's request was under consideration.

On April 13, however, he received another written response to his request. This appeared to be the same response, also signed by the same Unit Manager Mr. Gutierrez, but with a date of signature of April 10. Again, the response stated that the request was under consideration. The fact that Unit Manager Mr. Gutierrez signed one response dated April 6 and then again the same exact typed response on April 10 suggests that Mr. Gutierrez may not be reviewing these requests intently. Otherwise, why would he sign a response on April 10 that reads and appears exactly the same as the response that he had signed four days earlier, unless he had not read Mr. Delgado's request?

On April 16, Mr. Delgado went again to see Mr. Brown, his case manager. Mr. Brown had Mr. Delgado's request on his desk and indicated to Mr. Delgado that they had submitted his request. Mr. Brown related to Mr. Delgado appeared to be a good candidate for release as he did not pose a risk for recidivism. Nevertheless, the request was still pending consideration. Although Mr. Brown asked for Mr. Delgado's wife's name and address (a common procedure if BOP is truly investigating a transfer to home confinement), neither Mr. Delgado nor his wife have been contacted by BOP relative to release.

12

Clearly, current BOP policy dictates that Mr. Delgado would have to undergo a 14-day quarantine if he was chosen for transfer to home confinement. This has not happened, nor has he been given any indication that his request will be granted. Meanwhile, the virus was spreading rapidly at FMC Fort Worth with one death and three other persons carted away in the last five days. Mr. Delgado was holding out hope until he and other prisoners received a shock on April 23rd.

**F. Arbitrariness of BOP Release Policy.**

On April 23, Warden Wilson of FMC Fort Worth released a bulletin to the prisoners.  It announced that BOP policy changed on all home confinement requests; such requests would be prioritized according to whether the prisoner has served at least 50% of their sentence or served at least 25% and have 18 months or less to serve. Obviously, Mr. Delgado does not fit within this criterion.

Initially, the policy for transferring prisoners to home confinement in response to the COVID-19 pandemic was to allow transfer for those prisoners who pose a particularly high risk of severe illness and death, were convicted of a non-violent offense, and posed minimal likelihood of recidivism. The policy was not intended to be driven by how much of one's sentence a prisoner has served. As noted above, the Attorney General and Director of Bureau of Prisons were given authority to relax the criteria to qualify for compassionate release. On March 26, the AG released a memorandum authorizing BOP to begin releasing prisoners. *See* Memorandum for Director of Bureau of Prisons, Attorney General William Barr, March 26, 2020, attached hereto as Exhibit K. Attorney General Barr placed emphasis on the reason for change in policy:

TRANSFER OF INMATES TO HOME CONFINEMENT
WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

Ex. K, p. 1.

AG Barr's March 26 memo included criteria, ***none of which*** related to the percentage of time served. He mandated that an assessment be made "of the inmate's risk factors for severe COVID-19 illness,

13

risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." Attorney General Barr's second memorandum on April 3rd emphasized that focus should be made at those BOP facilities which are most affected. *See* Memorandum for Director of Bureau of Prisons, Attorney General William Barr, April 3, 2020, attached hereto as Exhibit L. The subject line of Attorney General Barr's second memo was: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19. *See* Exhibit L, p. 2.  Over three weeks have passed since the release of that memo. People have died and been infected within FMC Fort Worth since the release of that memo. There is an emergency situation within this facility.

Yet, for no apparent reason, the prioritization of criteria changed this past week. Undersigned counsel could not find anything published to indicate the reason for this sudden and unexpected change in policy. Indeed, neither directive issued by Attorney General Barr makes mention of an arbitrary percentage of sentence being served. Unfortunately, the BOP has been less than consistent in its application of AG Barr's direction. Many prisoners (not Mr. Delgado) were placed into quarantine in the last two weeks and their families were notified that prisoners were being prepared for release. Suddenly, without warning, BOP altered its strategy on April 23rd, pulled prisoners out of quarantine back into general population, and issued a new directive driven by percentage of time served. The change in strategy did not go unnoticed. *See* Politico, Trump Administration Reverses Prisoner Coronavirus Release Policy, Advocates Say, April 26, 2020, attached hereto as Exhibit M; Washington Post, Amid Coronavirus Pandemic, Federal Inmates Get Mixed Signals About Home-Confinement Release, April 24, 2020, attached hereto as Exhibit N; *see also United States v. Lewis Stahl,* No. 18-cr-694 (RA) (S.D. N.Y. Apr. 24, 2020) (U.S. District Judge Ronnie Abrams orders government to explain switch in policy).

### G.  Exhaustion of Administrative Remedy.

Although Mr. Delgado's administrative request has not been formally denied, it certainly has been effectively denied. The urgency of his medical condition coupled with what has occurred in recent weeks at FMC Fort Worth indicate that further efforts at obtaining administrative relief are futile.  If BOP followed its initial policy that focused on the health of the prisoner, it would have to recognize that Mr. Delgado is burdened with having six of the nine "risk factors for severe COVID-19 illness" identified by the CDC. *See* Exhibit A (analysis of factors discussed above). He is imprisoned at a prison facility which ranks **the highest in the nation** for persons who have contracted the COVID-19 disease, more than **three times** the next highest number. *See* Federal Bureau of Prisons, <u>COVID-19 Coronavirus</u>, printed April 26, 2020, attached hereto as Exhibit I.  Mr. Delgado has requested transfer to home confinement with his wife and no others, a place where there is minimal risk of infection, if at all. In short, he is a poster prisoner under the initial criteria described by Attorney General Barr and the CDC.

The President of the United States has declared a state of emergency because of the threat of the coronavirus to the lives of those in federal.  Courts have recognized that the judicial branch may act without waiting for a final decision by the BOP. *See FDIC v. Scott*, 125 F.3d 254, 258 (5ᵗʰ Cir. 1997)(when administrative exhaustion step is futile, court may waive requirement); *United States v. Perez*, No. 17-cr-513-3 (S.D. N.Y. Apr. 4, 2020).  Further, under this Court's supervisory powers the Court may formulate procedural rules not specifically required by the Constitution to implement a remedy for recognized rights.  *United States v. Santana,*  6 F.3d 1, 10 (1ˢᵗ Cir. 1993).  As the court found in *United States v. Perez*, even where exhaustion is mandated by statute the requirement is not absolute and may be waived by the district court. *United States v. Perez, supra* at 3-4, citing *McCarthy v. Madigan*, 503 U.S. 140, 146-147 (1992) & *Washington v. Barr*, 925 F.3d 109, 1118 (2d Cir. 2019).  The court recognized three circumstances where failure to exhaust may be excused. "First, exhaustion may be

unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Id.* Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id.* The Court found that "undue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. Finally, and obviously, [Perez] could be unduly prejudiced by such delay." *Id.* citing *Washington v. Barr, supra* & *Bowen v. City of New York,* 476 U.S. 467, 483 (1986) (irreparable injury justifies waiver of exhaustion requirements where severe medical setback may be triggered by administrative process). As noted by the *Perez* court, "even a few weeks' delay carries the risk of catastrophic health consequences" and found that "requiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate." *United States v. Perez, supra* at 4-5; *see also Miller v. United States,* No. 16-20222-1, 2020 U.S. Dist. LEXIS 62421 (E.D. Mich. Apr. 9, 2020) (court may waive exhaustion requirement if recognized exception applies); *United States v. Rodriguez,* No. 03-cr-00271-01 (E.D. Penn. Mar. 26, 2020) (initial denial of request by BOP render "almost certainty" that further administrative appeals would be "both futile and perilously time consuming; time Mr. Rodriguez does not have"); *United States v. Latrice Colvin,* No. 3:19-cr-179 (JBA) (D. Conn. Apr. 2, 2020) (compassionate release motion granted).

The District Court in the District of Connecticut found that waiver of exhaustion of administrative remedy was warranted ***even though the defendant had not yet received a response from BOP on her administrative request.*** *United States v. Latrice Colvin,* No. 3:19-cr-179 (JBA), p. 2 (D. Conn. Apr. 2, 2020). The Government objected to the defendant's motion, arguing that the BOP had not yet ruled upon her administrative request for transfer to home confinement, and thus the

16

defendant had not exhausted her administrative remedies. *Id.* The rejected the Government's objection, finding all three exceptions: (1) undue delay could result in catastrophic health consequences, making exhaustion futile, (2) exhaustion is unnecessary where the administrative process is incapable of granting adequate relief, and (3) exhaustion is unnecessary where pursuing agency review would subject the defendant  to undue prejudice. *Id.* at 3.

Similarly, all three exceptions apply in the instant case.   BOP officials received Mr. Delgado's first verbal request on April 1st; his first written request was submitted April 3rd. He has met with his case manager and unit manager several times since then and was told the request is being considered.

It is now 26 days after his request has been made, and BOP continues to delay giving him notice. Even more telling of the prospects of ultimately receiving a rejection is the posting of a bulletin that prisoners will be released to home confinement only if 50% of their sentence has been served (or 25% if they only have 18 months or less to serve). Waiting for a definitive, written rejection is using up time that Mr. Delgado does not have. Such a delay paints a picture of a dire emergency situation, given (a) his 6-level severe risk factors relative to COVID-19, (b) his prison facility is the highest ranked facility for COVID-19 infections, and (c) his fellow inmates are dying or contracting the virus at an alarming rate in the last few days, with no indication from whom each of them contracted the virus within the facility. Who in the FMC Fort Worth unit is carrying the disease? Just yesterday, it was published that "ninety-six percent of inmates in four state prisons who tested positive for coronavirus were asymptomatic." *See* The Hill, <u>Ninety Six Percent of Inmates in Four State Prisons Who Tested Positive for Coronavirus were Asymptomatic</u>, Marty Johnson, April 25, 2020, attached hereto as Exhibit O.

This added to the fact that there is no testing going on within FMC Fort Worth makes this an emergency situation. BOP's delay within the FMC Fort Worth facility could bring catastrophic health consequences, making exhaustion futile. We know that the coronavirus spreads exponentially. Because

of the delay visited by exhaustion, the relief the agency could possibly provide would likely be inadequate by the time it is provided. Mr. Delgado would be unduly and possibly irreparably prejudiced if he gets infected.

The provision allowing defendants to bring motions for compassionate release under § 3582(c) was added by the First Step Act "to increase the use and transparency of compassionate release." *Id.* at 5.  Multiple courts across the country are taking the initiative to address this severe health concern where the BOP is demonstrating that it is ill-equipped to do so, including several courts within the Houston Division of the Southern District of Texas.  A defendant is eligible for compassionate release if the Court finds "extraordinary or compelling reasons" to warrant a sentence reduction. 18 U.S.C. § 3582(c)(1)(A). The First Step Act did not define what "extraordinary or compelling reasons" warrant a sentence reduction, but the compassionate release statute directs the Court to consider the Sentencing Commission's policy statements when deciding compassionate release motions. *United States v. Gonzalez, supra* at 4, citing 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission's policy statement has not yet been updated to reflect the procedural change brought about by the First Step Act, however "[w]hile that particular policy statement has not yet been updated to reflect that defendants (and not just the [Bureau of Prisons ("BOP")]) may move for compassionate release, courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." *Id.* at 5, citing *United States v. McGraw,* No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019) (gathering cases). The Sentencing Commission policy statement on reductions of sentences under 18 U.S.C. § 3582(c)(1)(A) lists four specific categories of "extraordinary and compelling reasons" but expressly does not restrict what combination of factors can warrant release. U.S.S.G. § 1B1.13 (p.s.), comment. (n.1(A)-(D)). One category recognizes that there may "other reasons" not specifically identified in the application note but which recognize that an extraordinary situation may compel release. *See* Category D of note 1,

18

U.S.S.G. § 1B1.13; *see, e.g., United States v. Gonzalez, supra* at 6 (COVID-19 situation coupled with defendant's physical situation were sufficient "other reasons" to compel release).

Our country is experiencing an unprecedented change to our way of life. Persons and offices across the country, indeed the globe, have been forced to change our thinking and way of living. Courts and offices associated with the business of running the criminal justice system are no exception. Indeed, because this system includes the management of large groups of people at a time, extraordinary measures have been undertaken to protect those managing the system as well as the persons we are called to serve. Almost daily, orders are being issued by governing courts in the federal and state systems of justices. With the benefit of our internet, we can see at a glance what others are doing in different jurisdictions to respond to the current situation.

Evident from published reports, jails across the United States have taken unusual yet necessary steps to protect all involved. Mayor Bill de Blasio of New York City declared that "vulnerable" prisoners were to be released from jails. This announcement came days after the same action had been taken by the cities of Los Angeles and Cleveland. Los Angeles Sheriff Alex Villanueva stated the obvious: "Our population within our jails is a vulnerable population just by who they are, where they are located, so we're protecting that population from potential exposure." Santa Clara County Assistant Public Defender Charlie Hendrickson commented on the banding together of courts, attorneys and law enforcement officials: "This is a humanitarian crisis confronting all of us, and one of the most important ones is the jail. This is a time of urgent need and creativity. We're going to responsibly reduce the jail population." Mayor de Blasio stated that city officials would seek to identify those prisoners who were most vulnerable to infection due to underlying health problems. Other countries have taken the same approach with respect to their prisoners. One need only to type *"jails releasing prisoners to stem covid 19 coronavirus"* onto an internet search engine to find a wealth of publications on the topic.

Mr. Delgado's situation is not a close case. The sheer number of six at-risk factors that plague him in the midst of a particularly vulnerable location make this the exact type of extraordinary and compelling case that warrants an immediate response. This Court never intended its sentence of imprisonment to practically result in a death sentence. It is not hyperbole to consider that Mr. Delgado is serving a sentence in a situation in which there is a significant likelihood of severe illness and death. He has tried to make the best of his time there. He has a job as a "compound worker," walking the compound with a broom and dustpan to pick up trash throughout the compound. He initially applied for a job at the chapel or library but was not called for an interview; he did not sit on his hands and do nothing, but rather decided then to apply as a compound worker. Mr. Delgado was selected to work in the psychology department as a mental health "companion," helping other inmates who are experiencing trouble adjusting to prison life, but the "lockdown" of the prison facility on April 1 negated his opportunity. Mr. Delgado attends Narcotics Anonymous to address issues of alcohol use, and participates in the church choir, services and rehearsals. He also enrolled in a 12-month educational and spiritual program called "Threshold," which is a program for positive change, emotional and mental health, and personal responsibility, and also enrolled in a 13-week educational program called "A Sense of Self," designed with a life behavior curriculum.  FMC Fort Worth notified Mr. Delgado that he was eligible to participate in RDAP based on his past alcohol abuse and was scheduled to begin the program in July 2020, but that was before COVID-19 hit. Participation in RDAP would have reduced his sentence by 9 months. This reduction, together with a 15% reduction for good time and early release to a halfway house or home detention pursuant to the First Step Act of 2018, would mean that Mr. Delgado would likely have been released from imprisonment after 36 months of time served. A modification of sentence to time served with a condition of home confinement is not as stark given the reductions of time Mr. Delgado would likely receive. This type of modification is a remedy available to this Court. *See United States v. Kirk Lawrence Brannan,* No. 4:15-cr-00080-1 (S.D. Tex. Apr. 2, 2020) (Chief Judge Lee H. Rosenthal grants emergency

20

motion for compassionate release, reduces sentence from 36 months [issued on April 1, 2019] to time served, followed by 3-year term of supervised release, requiring at least 12 months home incarceration).

While Mr. Delgado appreciates that he has served 5 months of a "60-month" sentence, he never contemplated the extreme medical danger that he now faces. The Court may also consider that a reduction to time served (coupled with a condition of home confinement) can be based on the reasoning behind the "shock probation" sentencing concept utilized in Texas and other states. Under that methodology, a limited time in prison is deemed sufficient to advance the goals of sentencing under certain circumstances. Clearly, Mr. Delgado has worked hard in these past five months to address the factors that brought him to be investigated and prosecuted and is demonstrating a contrite and humble spirit. In other words, this motion is not being filed by a person who is moaning and complaining about being in prison, sitting around waiting for the day to be released. Mr. Delgado not only is burdened with a grave and serious health risk, but has demonstrated to a large degree, and will continue to demonstrate, that he is prepared to make amends for his sins and contribute to his community in a healthy and productive way. This assume, of course, that he is alive to do so.

WHEREFORE, Mr. Delgado humbly requests that this Court grant this motion and re-sentence him to a sentence of time-served or, alternatively, a sentence of time-served followed by a term of supervised release that requires home confinement for a period of time.

Respectfully submitted,

By:    */s/ Michael McCrum*
Michael McCrum
MCCRUM LAW OFFICE
404 E. Ramsey, Suite 102
San Antonio, TX 78216
Telephone: (210) 225-2285
ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2020, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

By:    */s/ Michael McCrum*
Michael McCrum

**CERTIFICATE OF CONFERENCE**

I hereby certify that I communicated with DOJ Trial Attorney Peter Nothstein about the instant motion. He indicated to me today, April 27, that he has sought to contact BOP officials at FMC Fort Worth but cannot reach anyone, and that he left a message but has not received a return call. Mr. Nothstein indicated that he cannot tell me the Government's position on the instant motion until he speaks with someone at FMC Fort Worth. Given the emergency nature of this motion, plus the fact that BOP officials are not responding to Mr. Delgado about his request either, the instant motion is being filed without knowing the Government's position.

By:    */s/ Michael McCrum*
Michael McCrum

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 18-CR-00115 |
| | § | |
| RODOLFO "RUDY" DELGADO, | § | |
| DEFENDANT | § | |

## ORDER

Came on to be considered Defendant's Emergency Motion for Compassionate Release. The Court finds that the motion should be granted. Accordingly,

IT IS HEREBY ORDERED that Defendant's Emergency Motion for Compassionate Release is granted.

SIGNED this _____ day of _____, 2020.

_____
Alfred Bennett
United States District Judge

23