UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL NO. H-18-CR-115-S3 |
| v. | § | |
| | § | |
| RODOLFO "RUDY" DELGADO | § | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

The United States of America, by and through undersigned counsel, respectfully submits this response to the defendant's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C § 3582(c)(1)(A)(i) (the "Motion"). The defendant, who has served fewer than six months of a 60-month sentence, argues in the Motion that he is entitled to immediate compassionate release because he bears risk factors for complications from COVID-19, should he contract it, and because he is presently housed at a medical facility where many other inmates have contracted the respiratory illness.

This Court should deny the Motion without prejudice because the defendant has failed to request compassionate release through the warden of the facility at which he is imprisoned, let alone exhaust his administrative remedies, which are statutory prerequisites to Court action. Should the Court reach the merits, it should deny the motion with prejudice because defendant has not met his burden of establishing that a sentence reduction is warranted under the statute, and because the defendant's request for early release would result in the defendant being sentenced to six months instead of 60 months, which is not consistent with the principles of justice contained in Section 3553(a).

1

## I.     FACTUAL BACKGROUND

### A.     BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.  In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i.  The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19

transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revise the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations.  The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease.  Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the movement of inmates and detainees among its facilities.[1]  Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease.  Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms.  Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms.  Staff registering a temperature of 100.4 degrees

---

[1]     The defendant asserts that he comes into close contact with other inmates throughout his day in Fort Worth FMC and that shared facilities are not regularly cleaned, but it is unclear whether this close contact and lack of cleaning was before or after BOP's response to COVID-19.

Fahrenheit or higher are barred from the facility on that basis alone.  A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.* medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates.  In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons (BOP), upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2),

and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.  As of this filing, BOP has transferred 1,576 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead.  But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.  For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.  It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.  It must assess release plans, which are essential to ensure that a defendant has a safe place to live

and access to health care in these difficult times.  And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

### B.    The Defendant's Trial, Conviction and Sentence

On February 28, 2018, a federal grand jury in Houston, Texas returned an indictment against the defendant charging him with three counts of federal program bribery in violation of 18 U.S.C. § 666 and three counts of interstate travel in aid of racketeering (also known as the "Travel Act") in violation of 18 U.S.C. § 1952.  The grand jury superseded this indictment on June 19, 2018, July 25, 2018, and November 15, 2018.  The final charging instrument accused the defendant of one count of conspiracy to commit federal program bribery in violation of 18 U.S.C. § 371, three counts of federal program bribery in violation of 18 U.S.C. § 666, three counts of Travel Act offenses in violation of 18 U.S.C. § 1952 and one count of obstruction of justice in violation of 18 U.S.C. § 1512.

The defendant proceeded to a jury trial on these charges.  The trial was held in McAllen, Texas from July 3-11, 2019.  At trial the jury convicted the defendant of all charges.  The defendant had been on bond for these charges since his arrest in the case, and after he was convicted the United States moved for the Court to have his bond revoked and have him taken into custody.  The Court denied this request and allowed the defendant to remain on bond pending sentencing.

On September 25, 2019, this Court sentenced the defendant to 60 months of imprisonment and a two-year term of supervised release.  The Court found the defendant was facing an advisory

range of imprisonment of 78-97 months for the crimes he was convicted of, but imposed a below-guidelines sentence, at least in part because of the defendant's age and medical conditions. After sentencing, the United States moved for the Court to have the defendant taken into custody, but the Court denied this request and allowed the defendant to remain on bond pending his designation to a facility in BOP to serve the custodial portion of his sentence.

BOP designated the defendant serve his sentence at the Federal Medical Center facility in Fort Worth, Texas (FMC Fort Worth), and the defendant reported there on November 19, 2019. He has served fewer than six months of his 60-month sentence.

### C.      Procedural Background

According to the defendant, on April 1, he met with his case manager, "Mr. Brown" and "requested a release to home confinement." Mot. at 11. The defendant asserts that on April 3 he submitted to "Mr. Brown" and "Unit Manager Mr. Gutierrez" a "Form FTW 1330.13, commonly referred to as 'BP 8' requesting transfer to home confinement." *Id*. at 12. The defendant was advised that his request was under consideration. *Id*. The defendant further asserts that on Thursday, April 23, the inmates at FMC Fort Worth were advised that requests for release to home confinement would be "*prioritized* according to whether the prisoner has served at least 50% of their sentence or served at least 25% and have 18 months or less to serve." *Id*. at 13 (emphasis added).

According to BOP counsel, the defendant's request for home confinement was denied on April 20 and the defendant was informed of this decision.[2] BOP's records do not show that the

---

2      The defendant's supplemental motion, filed on May 2, suggests that the government has capriciously and unnecessarily delayed in responding to the defendant's request for release. *See* Dkt. 192 at 1-2. This is not the case. On Sunday, April 26, at 6:39 pm ET, counsel for the defendant provided government counsel with his proposed motion for compassionate release and requesting a response from the government "asap, given the emergency nature of this

7

defendant has initiated any appeal of BOP's decision.  *See* Ex. A.

The defendant has not submitted a request for compassionate release to the warden of FMC Fort Worth.  The defendant's April 1, 2020 request for home confinement to his case manager is not a request for compassionate release, which can only be submitted directly to the warden of the facility where an inmate is being housed.

## II.    LAW AND ARGUMENT

Under 18 U.S.C. § 3582(c)(1)(A), a court may reduce a defendant's term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with guideline policy statements, commonly referred to as "compassionate release."  Under the statute, as amended by the First Step Act, a court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id*.  Therefore, under § 3582, a defendant must first exhaust administrative procedures with BOP regarding his request for compassionate release before a court may act on that defendant's compassionate release motion.

---

motion."  *See* Ex. B.   At 6:28 am ET the next day, government counsel responded, informing counsel for the defendant that given the urgency, government counsel would review and respond promptly.  *Id*.

Government counsel then began to attempt to contact the defendant's case manager at Fort Worth FMC to collect key facts not included in the defendant's proposed motion, such as whether the defendant had made a request for compassionate release and BOP's position on such a request.  At 9:07 am ET, counsel for the defendant requested a response by the government by "10am," presumably central time.  The government responded by informing counsel for the defendant that efforts were underway to contact the defendant's case manager and requesting the case manager's contact information to facilitate those efforts.  *Id*.  Counsel for the defendant indicated that he did not have the requested contact information. *Id*.  At 11:41 am CT, counsel for the defendant filed the instant motion.

Over the ensuing days, the government has dutifully attempted to collect from BOP information that is important to this Court's consideration of the defendant's motion.  It was only late on May 4 that the government was able to determine the status of the defendant's request for home confinement.  This filing followed.

Compassionate release, a sentencing option available to this Court once the defendant has exhausted his administrative remedies, is separate and distinct from BOP's ability to transfer the defendant to home confinement.  Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration.  *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (*per curiam*); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").  Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (*per curiam*). Section 3582(c) contemplates only a reduction in sentence.  *See* § 3582(c). Because the defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.  A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993).

### A.     The Defendant Has Not Exhausted Administrative Remedies.

This Court lacks authority to act on the defendant's motion for compassionate release at this time.  The defendant has requested *home confinement* from BOP, which is solely within the province of BOP, but the defendant's motion asks this Court for compassionate release, which this Court is not empowered to grant until the defendant has first requested compassionate release from the warden of FMC Fort Worth and exhausted his administrative remedies.  The defendant has not made the required request for compassionate release to the warden of FMC Fort Worth, so he has not even begun the administrative remedies clock.

Neither the defendant's April 1 in-person request for "release to home confinement" (Mot. at 11) nor his April 3 request for home confinement through a "BP 8" constitutes a request to the warden, which  begin the 30-day time period under 18 U.S.C. § 3582.  The defendant is statutorily-required to first present his request to the warden of his facility, permitting the warden to evaluate the inmate's current circumstances in light of the COVID-19 concerns, before this Court is authorized to act on his compassionate release motion.  This Court cannot grant judicial relief until, as the statute provides, the warden either denies the request or 30 days have passed since the warden of FMC Fort Worth received the defendant's request, whichever is earlier.  Because the defendant has not yet exhausted his administrative remedies as required by law, this Court should dismiss his motion.  *See United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (holding, in a case involving a compassionate release motion based on COVID-19 concerns, "[b]ecause defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief under § 3582(c)(1)(A)(i).").

The exhaustion requirement exists because BOP is in by far the best position to determine how to best prevent inmates at a given facility from being exposed to or infected by COVID-19, and also in the best position to provide care to an inmate who may contract the disease.  This fact is especially true regarding a potential outbreak in one of their medical facilities, such as the one where the defendant is housed.   There are numerous valid ways for BOP to deal with such a potential problem that they should be allowed to consider and potentially implement before this Court should consider granting the defendant the extreme relief he seeks.  Among the options BOP could consider include transferring this defendant to another facility, COVID-19 testing of FMC Fort Worth inmates and isolation or separation of those who are positive from those who are not,

10

and myriad other methods of dealing with this issue that BOP and FMC Fort Worth officials would presumably be in a much better position of developing than any parties to this litigation.

None of the cases cited by the defendant for the proposition that this Court may ignore the requirement that the defendant exhaust his administrative remedies before this Court can act are plainly distinguishable. *See* Mot. at 16. In each of the cases, the defendant had served nearly the entire sentence. In *Perez*, the defendant had only three weeks remaining on his three-year sentence, logically leading the Court to find that " pursuing the administrative process would be a futile endeavor; he is unlikely to receive a final decision from BOP, and certainly will not see 30 days lapse before his release date." *United States v. Perez*, 17-cr-513-3-AT, Dkt. 98 at 5 (S.D.N.Y. Apr. 1, 2020) (Ex. C).

In *Colvin*, the defendant was sentenced to a term of imprisonment of 30 days, commencing on March 16, 2020. *United States v. Colvin*, 3:19-cr-179-JBA, Dkt. 38 at 1 (D. Conn. Apr. 2, 2020) (Ex. D). At the time of her motion, Colvin had only eleven days remaining on her sentence. *Id*. The Court found, in part, that the Colvin need not exhaust her administrative remedies because "given the brief duration of Defendant's remaining term of imprisonment, the exhaustion requirement likely renders BOP incapable of granting adequate relief, as her sentence will likely already have expired by the time her appeals are exhausted and would certainly already have expired by the time the thirty-day waiting period ends." *Id*. at 3.

Finally, the defendant's citation to *United States v. Rodriguez* is not, as it appears to be, a citation to an order of the district court. Mot at 16. The quote provided by the defendant is from a motion filed by the *defendant's counsel* seeking to waive the administrative exhaustion requirement. *United States v. Rodriguez*, 2:093-cr-00271-AB, Dkt. 128 at 2 (E.D.P.A. Mar. 26,

11

2020) (Ex. E).  The district court in that case granted the defendant compassionate release but did not rule specifically on the defendant's request for waiver.  *Id.*, Dkt. 135 (Apr. 1, 2020) (Ex. F). In its opinion, however, the district court noted that "Mr. Rodriguez has served the *vast majority* of his sentence, *seventeen years*. He is *a year and a half away from his release date*."  *Id.* at 19 (emphasis added).

The defendant has not cited to a single case in which a district court has waived the administrative exhaustion requirements for an inmate seeking compassionate release where the defendant has served almost none of the duly imposed sentence.  To the contrary, the cases show that district courts heavily weigh imminent release from incarceration when considering waiver of administrative remedies.  This Court should not excuse the defendant from the requirement to exhaust his administrative remedies.

### B.   The Defendant Is Not Entitled to Compassionate Release

Alternatively, the defendant's motion should be denied because it also fails on the merits, for three reasons.

### 1.   The Defendant's COVID-Related Concerns Do Not Constitute Extraordinary and Compelling Reasons for Release.

Section 3582(c)(1)(A) provides that any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  Here, the applicable policy statement, USSG § 1B1.13, provides no basis for a sentence reduction based on COVID-19.  Rather, the policy statement allows a reduction for "extraordinary and compelling reasons" only if the reasons are "consistent with this policy statement."  USSG §§ 1B1.13(1)(A) & (3). Application Note 1 to the policy statement then explains that "extraordinary and compelling reasons exist under any of the circumstances set forth below," which include only (a) a defendant

suffering from a terminal illness or other medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (b) a defendant at least 65 years old who "is experiencing a serious deterioration in physical or mental health because of the aging process" and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less"; (c) a defendant who has minor children without a caregiver or with an incapacitated spouse or partner who needs the defendant to be the caregiver; or (d) "[a]s determined by the Director of the Bureau of Prisons, . . . an extraordinary and compelling reason other than, or in combination with, the [above] reasons."  USSG § 1B1.13, comment. (n.1).

With regard to the last consideration relating to extraordinary and compelling reasons the Director of BOP has identified, BOP has issued a regulation defining its own consideration of compassionate release requests.  *See* BOP Program Statement 5050.50, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  This program statement was amended effective January 17, 2019, following the First Step Act's passage.  It sets forth in detail BOP's definition of the circumstances that may support a request for compassionate release, limited to the same bases the Sentencing Commission identified: serious medical condition, advanced age, and family circumstances.  The defendant might argue that this policy statement is only advisory, but to do so would be incorrect.  The policy statement is binding under the express terms of Section 3582(c)(1)(A), and because it concerns only possible sentence reductions, not increases, it is not subject to the rule of *Booker v. United States*, 543 U.S. 220 (2005), that mandates any guideline that increases a sentence must be deemed advisory.  *See Dillon v. United States*, 560 U.S. 817, 830 (2010) (making clear that the statutory requirement in Section 3582 that a court heed the

13

restrictions stated by the Sentencing Commission is binding).

Neither the policy statement nor BOP regulation provides any basis for compassionate release based on general COVID-19 concerns. The grounds for compassionate release the Commission identified are all based on inherently individual circumstances such as health, age, and family responsibilities, and, not on anything remotely comparable to the general COVID-19 concerns that any inmate could cite in compassionate release motions as a basis for release. At least one district court has already denied a defendant's compassionate release motion on this basis. *See United States v. Eberhart*, No. 13-cr-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("As defendant does not assert that he is suffering from a medical condition as defined in U.S.S.G. § 1B1.13, a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").

2.   The Defendant Has Not Shown That BOP Is Incapable of Managing the Situation Such that Release Is Warranted.

Even If COVID-19 concerns were to qualify as extraordinary and compelling circumstances under the policy statement, the defendant has not shown that BOP is incapable of managing the situation such that release is warranted. BOP is monitoring the situation on a daily, and often hourly, basis, and has taken aggressive action to mitigate any health risks for prisoners.[3] The defendant is already being held in a BOP medical facility–if the defendant were to unfortunately contract COVID-19, he is in one of the best places for him to be treated for it.

BOP has been planning for potential COVID-19 transmissions since January. At that time,

---

[3]    The following information comes from https://www.bop.gov/resources/news/20200313_covid-19.jsp and https://www.bop.gov/coronavirus/index.jsp.

the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.   As is stated above, BOP announced on March 13, 2020 that it was implementing a Phase Two Action Plan to minimize the risk of COVID-19 transmission into and inside its facilities.   The Action Plan comprises several preventive and mitigation measures, including the following:

Screening of Inmates and Staff: All new BOP inmates are screened for COVID-19 symptoms and risk of exposure.   Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols.   In areas with sustained community transmission and in medical referral centers, all facility staff will be screened for self-reported risk factors and elevated temperatures. Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.,* medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.    All volunteer visits are suspended absent authorization by BOP Deputy Director.   Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

Suspension of Social Visits and Tours: BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees.   To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.   Tours of facilities are also suspended for at least the first 30 days that the Action Plan is in effect.

Suspension of Legal Visits: BOP has also placed a 30-day hold on legal visits, though such

15

visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Suspension of Inmate Movements: With limited exceptions, BOP has also ceased the movement of inmates and detainees among its facilities, and all inmates who are set to be moved are first being screened for COVID-19 symptoms.  This will prevent transmissions between institutional populations.  Likewise, all official staff travel has been cancelled, as has most staff training.

Modified Operations: The Action Plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.  Among the possible actions are staggering of meal times and recreation time.

Taken together, the above measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution.  BOP professionals will continue to monitor this situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

In addition, COVID-19 is a disease that is not limited to correctional facilities, and there is no guarantee an inmate who is released will not be exposed to or contract the disease.  For these reasons, modifying the defendant's sentence as he requests would likely not result in any meaningful mitigation of the risk he may face of contracting COVID-19.  In fact, this defendant is much more likely to avoid getting COVID-19 in the controlled environment found in a BOP facility than if he were to be released into the community and left to his own devices.  This defendant has shown a lack of regard for the laws and rules of society over a period of years, and it is unlikely he will suddenly start taking all recommended precautionary measures necessary to

16

avoid contracting the virus if he were released.  The defendant has also shown a disregard for his own health over the years, most specifically by continuing to drink alcohol heavily even after he was somehow able to procure a liver transplant for himself.  The evidence does not support that the defendant would suddenly start to follow medical advice to avoid contracting COVID-19 if he were granted the relief he seeks.  For these reasons there would be no meaningful mitigation of the risk the defendant faces regarding COVID-19 were he to be released.

Furthermore, defendant's health concerns are what led him to be placed in a Federal Medical Center to serve his sentence, which is a facility designed, staffed and equipped to appropriately address and treat any medical concerns the defendant may have, including the possibility of contracting COVID-19.  There is also no indication the defendant will not be exposed to COVID-19 in McAllen, Texas area should he be released, nor can BOP show he may not transmit the virus to others in the community there if he has already been exposed to it.  Releasing the defendant as he requests would not effectively mitigate the risk to him or others regarding COVID-19, nor would it address the other medical conditions he has which BOP is currently treating while he is at FMC Fort Worth.

Moreover, per the Attorney General's instruction, BOP is also prioritizing the use of BOP's various statutory authorities (such as 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g)) to grant home confinement in appropriate circumstances for inmates seeking transfer in connection with COVID-19.[4]  Per this procedure, if the defendant is statutorily eligible for home confinement and meets certain other criteria, before BOP grants discretionary release, a BOP Medical Director will "make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-

---

[4]      This information comes from the publicly available memorandum from the Attorney General to BOP Director, available at https://www.justice.gov/file/1262731/download.

19 at the inmate's prison facility, as well as the risks of COVID-19 at the location at which the inmate seeks home confinement."

Given all of the above, judicial action is unnecessary and would be detrimental to this process as it would inevitably result in scattershot treatment of inmates and contravene BOP's organized, comprehensive approach of granting home confinement under consistent criteria to eligible inmates in its custody.  As just outlined, BOP is also employing practices to keep the prison population at low risk for COVID-19 spread.  Accordingly, the government opposes judicial action in individual cases such as this one.

In addition, the Fifth Circuit has already denied prisoners' motions for bail pending appeal that rested on COVID-19 concerns.  *See United States v. Anderson*, Fifth Cir. No. 19-10963 (3/19/20 & 3/23/20 orders).  District courts in other districts have also denied similar motions. *See, e.g.*, *United States v. Gileno*, No. 3:19-cr-161, 2020 WL 1307108 (D. Conn. Mar. 19, 2020); *United States v. Cohen*, No. 18-cr-602, 2020 WL 1428778 (S.D.N.Y. Mar. 24, 2020).  As the *Gileno* court reasoned:

> With regard to the COVID-19 pandemic, Mr. Gileno has . . . not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno.  The Court takes judicial notice of the fact that public health recommendations are rapidly changing. But at this time the Court cannot assume that the Bureau of Prisons will be unable to manage the outbreak or adequately treat Mr. Gileno should it emerge at his correctional facility while he is still incarcerated.

*Id*. at *4 (citation omitted).

3. <u>Resentencing the Defendant to a Six-Month Sentence Instead of a 60-Month Sentence, Would Not be Consistent with the Principles of Section 3553(a).</u>

18

The defendant's request for compassionate release is essentially a request that this Court commute more than 90% of his 60-month sentence.  He is asking this Court to ignore the crimes that this Court described as "tearing at the fabric of society."  This Court frequently observed during trial and sentencing that the defendant's case was of keen interest to the people of the McAllen area, particularly the jury, who were "adamant" and "angry" when this Court spoke with them after trial.  According to this Court, their anger was "because they though that the conduct they saw . . . had become the way of doing business in the place they call the Valley—and the public wants it stopped."

That *any* prisoner who has only served less than 10% of his adjudged prison sentence should be released from custody because he *may* be at risk of contracting COVID-19 would be a miscarriage of justice.  Erasing the defendant's wholly-justified 60-month sentence would absolve the defendant of *any* punishment for his wrongdoing and send a terrible message to the local community the defendant was previously sworn to serve.  Release at this point would not be consistent with the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C § 3553(a)(a)(A).  It would allow him to avoid any meaningful consequences for the approximately decade-long corruption scheme he was convicted of engaging in, and make it appear he was above the law.  There would truly be almost no consequences to him for the serious crimes the defendant has committed, crimes that strike at the very heart of the public's faith in their judges and the criminal justice system as a whole.

Release at this time would also not "afford adequate deterrence to criminal conduct" to other public officials who consider abusing their positions of power and trust.  *Id*. at §

19

3553(a)(2)(B).  Too often the public perceives that officials are given preferential treatment when charged with crimes, and releasing the defendant from any meaningful punishment simply because he is at higher risk for complications should he contract an illness he does not have would only reinforce that perception, making it reality.

Throughout his case, the defendant has already used his age and health conditions to his benefit on numerous occasions.[5]  He has used those things to help justify him getting a bond pending trial, to allow himself to stay out on bond after being convicted, to argue for the Court to give him a custodial sentence below what the Guidelines advised, and to stay out on bond after sentencing and voluntarily surrender to BOP.  The defendant should not be allowed to use his age and medical conditions to once more avoid any meaningful consequences for the very serious crimes for he was convicted and sentenced.

The defendant claims in his Motion that this case is not a close one.  The government agrees, but not for the reasons the defense asserts.  This Court should not seriously consider granting the defendant's requested extreme and unwarranted remedy.

The crimes the defendant has been convicted of showed the defendant engaged in a pattern of using his office for personal gain for years, with no regard for his oath of office or the citizens of Hidalgo County.  The evidence at trial showed that for years he viewed his office as his personal fiefdom to do as he pleased, to include enriching himself, with impunity.  The defendant is simply continuing to manifest his selfish behavior by yet again trying to use his age and medical conditions as a way of avoiding responsibility for these crimes.  His age and medical conditions never got in

---

[5]     Notably, one of the health conditions on which the defendant relies for his request for compassionate release is his liver transplant more than 10 years ago.  Mot. at 2-3, 5.  As this Court is aware, one of the justifications the defendant put forth for his behavior throughout the trial was excessive drinking.  It appears that the defendant now demonstrates more concern for his health condition than he did over the previous decade.

the way of him committing his crimes, and they should not be something he can hide behind now to avoid the consequences of his actions.  He already received a very generous sentence relative to the advisory range of imprisonment he faced, despite never taking responsibility for his actions. Granting him the additional and extreme relief he now seeks is not warranted by the facts of this case, the law or common sense, and would not be in the interests of justice.

## III.   <u>CONCLUSION</u>

For all of the reasons detailed above, we respectfully request the Court deny the defendant's Emergency Motion for Compassionate Release.

Respectfully submitted,


RYAN PATRICK                                        COREY R. AMUNDSON
UNITED STATES ATTORNEY              CHIEF, PUBLIC INTEGRITY SECTION


  /s/Arthur R. Jones                                    /s/ Peter M. Nothstein
Arthur R. Jones                                        Peter M. Nothstein
Assistant United States Attorney               Senior Litigation Counsel
Southern District of Texas                        Public Integrity Section
Direct Line: (713) 567-9357                     Criminal Division
Email: Arthur.Jones@usdoj.gov               Direct Line: (202) 616-2401
                                                              Email: Peter.Nothstein@usdoj.gov


  /s/ Robert L. Guerra
Robert L. Guerra
Assistant United States Attorney
Southern District of Texas
Direct Line: (956) 992-9354
Email: Robert.Guerra@usdoj.gov

## CERTIFICATE OF SERVICE

I, Arthur R. Jones, certify that a true and correct copy of this notice was served on counsel

for defendant via electronic case filing on this, the 6th day of May, 2020.


By:   /s/ Arthur R. Jones
ARTHUR R. JONES
Assistant United States Attorney