UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 18-CR-00115 |
| | § | |
| RODOLFO "RUDY" DELGADO, | § | |
| DEFENDANT | § | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE
TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

TO THE HONORABLE JUDGE OF THE SOUTHERN DISTRICT OF TEXAS:

NOW COMES, Defendant Rodolfo Delgado, by and through his undersigned attorney, and, submits this Reply to the Government's Response to his Emergency Motion for Compassionate Release.

## I.   **Procedural History.**

**_Mr. Delgado's Initial Motion:_**   On Monday, April 27, 2020, Mr. Delgado filed his Emergency Motion for Compassionate Release. *See* Docket No. 191. The motion informed the Court that 217 inmates at the FMC Fort Worth facility had tested positive for COVID-19. *See Id.*, p. 10.

**_The Court's Directive:_**   The following day, the Court's law clerk notified the attorneys for each party that the Court intended to address the motion on an expedited basis and requested the Government to submit a response "no later than Wednesday, May 6," clearly conveying to the Government that it could file an earlier response.

**_Mr. Delgado's Plea for an Earlier Response:_**   On April 29, undersigned counsel delivered to Government counsel Nothstein an email relating a concern that BOP's website

released updated information relative to FMC Fort Worth, reflecting a thirty-seven percent (37%) increase from the number reported two days earlier, and reported two more persons had died (an increase from one person to three persons). Undersigned counsel urged the Government to file its response as soon as possible. Attorney Nothstein replied that he was still waiting on a response from Mr. Delgado's case manager, and "to the extent" an earlier response could be filed, the Government would do so. This email exchange is attached to the Government's Response.

**_Mr. Delgado's Supplement to Motion:_**   On May 2, 2020, Mr. Delgado filed a supplement in the instant case providing the Court with updated information relative to the crisis at FMC Fort Worth. The number of persons infected with COVID-19 had increased approximately two hundred twenty nine percent (229.49%) from the number provided five days earlier.

**_Government's Response:_**   Though the Court indicated that the Government file its response "no later than May 6," the Government waited to the last day, May 6, to file its response. _See_ Govt Response, Docket No. 193. The Government offered its reasoning for waiting until May 6:  In Footnote 2 on pages 7 and 8 of its response, the Government indicated that "the government has dutifully attempted to collect from BOP information that is important to this Court's consideration of defendant's motion." It added, "[i]t was only late on May 4 that the government was able to determine the status of the defendant's request for home confinement." Although the Government's response contains pages of information relative to BOP's nationwide response to COVID-19, the Response is notably absent of details of what has occurred and is occurring within the FMC Fort Worth facility, other than to repeat what Mr. Delgado had already stated in his motion - - that his request for transfer to

2

home confinement was not submitted directly to the Warden, but rather was submitted "to his case manager Mr. Brown and his Unit Manager Mr. Gutierrez" "on a completed form (Form FTW 1330.13, commonly referred to as 'BP 8'"). *See* Delgado Motion, Docket No. 191, pp. 11-12. While it waited until May 6 to purportedly provide information relative to FMC Fort Worth, the only information its provides that was not apparent from Defendant's motion is that "BOP Counsel" informed Government counsel that Mr. Delgado's request was denied on April 20. This is a fact not previously known to Mr. Delgado, as he did not receive notice of the administrative denial until May 5th (*see* page 13, below).

 ***Current Status of Administrative Request:*** On May 5th, the day before the Government filed its Response in the instant case, Mr. Delgado first received notice that FMC Fort Worth rejected Mr. Delgado's administrative request. Mr. Delgado was told by his case manager, Mr. Brown (i.e., the same person the Government indicated that it was seeking to communicate with during the ten days previous to its filing) that the administration rejected his request because he had not served at least 50% of his sentence.

## II. Reply to Government's Response.

 Mr. Delgado offers the following reply to the Government's response.

### A. BOP's Nationwide Response to COVID-19:

 The Government presents over five pages of information addressing BOP's nationwide response to the COVID-19 crisis (i.e, BOP's nationwide initiation and execution of a plan; restriction of visitation; and allowing release to home confinement for inmates "who are most vulnerable to the disease and pose the least threat to the community"). The Government's theme appears to be that BOP is taking sufficient measures **nationally** to protect its inmates, but that is mission "must" include consideration of "the effect of a mass

release on the safety and health of both the inmate population and the citizenry." *See* Govt Response, Docket No. 193, p. 5.

Mr. Delgado is not seeking to prove that BOP has failed to exert effort to protect its inmates and staff. Rather, his motion and supplement are narrowly focused on (1) the situation at FMC Fort Worth in particular, and (2) Mr. Delgado's unique and compelling medical situation vis-a-vis the FMC Fort Worth facility environment. The Government's response is glaringly absent of information as to why FMC Fort Worth has ranked either first or second in the nation's federal prisons in highest number of persons infected, as well as in the upper ranking in numbers of deaths. The Government has not offered any information as to why FMC Fort Worth, with over 450 infected inmates today, has had more than twice the next-ranked facility in highest number of infected inmates (Butner FCI, Butner, North Carolina, with 211 inmates infected). Indeed, the Government's response does not mention FMC Fort Worth in terms of what is being done at that facility, and remarkably is absent of even an acknowledgement that there exists a serious problem at the FMC Fort Worth facility. The Government's presentation in its Response of what is being done nationally offers scant explanation as to why BOP's nationwide measures are apparently insufficient in the context of FMC Fort Worth's unique situation.

The Government's response fails to note that yet another FMC Fort Worth inmate died three days before the Government filed its response. In its response, it notes that it learned about FMC Fort Worth's situation on May 4th. Yet, on May 3rd, 2020, three days prior to the filing of the Government's response, the BOP (an agency also within the U.S. Department of Justice) published a notice on its website that a fourth inmate of FMC Fort Worth died as a result of the COVID-19 virus. *See* Bureau of Prisons Public Release, ***Inmate Death at FMC***

**_Fort Worth_**, May 3, 2020, attached hereto as Exhibit A. Why did the DOJ-assigned attorneys for the Government not inform the Court in its expansive presentation of BOP's progress against COVID-19?   The entirety of the Government's response insofar as nationwide measures being taken by BOP does not address the critical facts that (a) such measures are insufficient to prevent or even slow virus infections within the FMC Fort Worth medical care facility, and (b) inmates who are afflicted with severe risk factors within FMC Fort Worth are more vulnerable than other federal prisoners to suffering severe consequences of the virus.

The BOP's May 3rd notice is particularly applicable to the analysis of Mr. Delgado's situation. On Sunday, April 26, 2020, 59-year-old prisoner Kevin Ivy was seen by FMC Fort Worth staff for coughing, shortness of breath, fatigue, body aches and other symptoms. He was transported to a local hospital for treatment (apparently the same day). While at the hospital, he tested positive for COVID-19 (it appears he had not been tested at FMC Fort Worth for COVID-19, which is consistent with Mr. Delgado's observation that neither he nor others he has seen are being tested within this facility). Four days after being taken to the hospital, Mr. Ivy's condition declined, and he was placed on a ventilator. Two days after that, he died. Six days after experiencing the above-described symptoms, and despite action taken by FMC Fort Worth prison officials, Mr. Ivy died.  The death of Frank Ivy is significant to our analysis for the following reasons:

1. Despite FMC Fort Worth's effort to implement social distancing and other measures (for purposes of this Reply, we can only assume that FMC Fort Worth is executing the BOP nationwide plan of attack described in the Government's response, as the Government has not provided proof of such fact), an inmate at that facility contracted

the virus as recent as the last week of April. The virus is not contained within that facility, despite the measures described in the Government's Response.

2. Mr. Ivy is described in BOP's notice as having been afflicted with *"long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease [sic]." See* Exhibit A. The BOP even acknowledges in its published notice that Mr. Ivy's rapid decline from experiencing undiagnosed symptoms (coughing, shortness of breath, fatigue, body aches) to death in the span of six days directly relates to Mr. Ivy having been afflicted by CDC's designated risk factors. Otherwise, inclusion of this information in the relatively brief notice would not have occurred. This is the exact concern expressed in Mr. Delgado's motion. As exhaustively explained in his motion, Mr. Delgado is afflicted with six of the nine risk factors identified by CDC for developing a more severe ***reaction*** to the COVID-19 disease. It is not only an issue of whether Mr. Delgado will contract the virus (which obviously FMC Fort Worth's second highest ranking makes evident that contraction of the disease is more probable there than all but one other federal prison), but it is the rapid progression of severe consequences once the virus is contracted.

The Government posits that Mr. Delgado has "not shown that the BOP is incapable of managing the situation such that release is warranted." *See* Govt Response, p. 14. In other words, the Government argues that FMC Fort Worth is capable of managing (1) whether an inmate contracts the disease, and (2) the severity of the inmate's response (i.e., whether or how quickly the inmate could die, despite a quick medical response). Mr. Ivy's contraction of the virus, despite all of the measures being taken at that facility and nationwide, coupled with his rapid 6-day decline and death that occurred despite prison officials' quick

6

transportation of Mr. Ivy to a local hospital the same day they took note of his symptoms, is proof of two things:  (1) FMC Fort Worth is incapable of preventing its prisoners from contracting the virus, proved most recently by Mr. Ivy's symptoms on April 26, 2020, and (2) despite taking him to a local hospital, the presence of CDC-identified risk factors make it improbable that BOP, and hospitals for that matter, are capable of "managing the situation." Indeed, the Government offers no proof to the contrary. The prison's "aggressive action" being taken "on a daily, and often hourly, basis" (as described by the Government on pages 14 through 16 of its Response) is insufficient when confronting this particular virus in the midst of persons in this prison facility who possess that degree of CDC-identified risk factors. The Government's presentation of BOP's steps in January and March of 2020 literally have not been enough.

Again, Mr. Delgado is not seeking a finding by this Court that BOP has been negligent or deliberately indifferent to his medical situation. Rather, his motion is presenting an irrefutable argument that (a) the nature of his afflictions in combination with (b) the unique dangers of this virus and (c) the fact that he is in the midst of an environment where "social distancing" is literally impossible, warrants release.

### B.  Government's Procedural Argument

The Government argues that Mr. Delgado did not submit the proper document to the Warden, and even if the documents he submitted could be interpreted as compliance with the administrative requirement, enough time has not elapsed before he can seek relief from the court. *See* Govt Response, p. 10.

### 1. The Facts.

Here is the timeline:

7

1. March 26:  AG Barr issues his first directive to BOP. He states there are "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *See* Exhibit K to Delgado Motion, Docket No. 191-11.  AG Barr orders that factors be taken into account in making this determination, including first, "the age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines" (Delgado is afflicted with 6 of the 9 CDC risk factors). AG Barr also orders that the BOP consider CDC guidance, the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement" (Delgado is afflicted with 6 of 9 CDC risk factors; FMC Fort Worth second highest number of COVID-19 infections; risk of Delgado contracting COVID-19 at home is extremely low with only two non-infected persons living in the residence).

2. April 1:  Mr. Delgado meets with his assigned prison case manager, Mr. K. Brown, and verbally requests a release from the facility. Mr. Delgado is told that "specific directives are not in place" and so he should fill out the FORM BP-8 to request administrative release from FMC Fort Worth.  Delgado Brown directs Delgado to return to his office on April 3.

3. April 2:  Mr. Delgado speaks with his assigned prison counselor, Mr. A. Cruz, about making a request for release due to his medical condition and the COVID-19 risk factors. Mr. Cruz gives Mr. Delgado a BOP Form to fill out.  Mr. Delgado fills out the form. *See* "REQUEST FOR ADMINISTRATIVE REMEDY - ATTEMPT AT INFORMAL

RESOLUTION," Copy of Delgado Written Request, attached as Exhibit B to this Reply. The form indicates at the top right corner that Mr. Delgado dated it April 2, 2020, and noted "A. Cruz" as the "Staff" person who he spoke with. The written request confirms the effort Mr. Delgado expended in making the request and the fact that he had been told *"specific directives are not in place"* in order to make administrative requests for release:

> *"I have spoken with Counselor A. Cruz and Case Manager K. Brown who advise that specific directives are not in place and that I request administrative remedy or informal resolution."*

As noted below, prison officials later sign his request, and do not refute Mr. Delgado's statement that he was told *"specific directives are not in place"* nor is he informed that his request for *"administrative remedy"* should be directed directly to the Warden. Mr. Delgado notes on the form that he has been on immunosuppressant medication (which is a CDC risk factor), is a liver transplant recipient, and is fearful that he is "at great risk of grave or fatal results due to the COVID-19 pandemic." Mr. Delgado references AG Barr's March 26 directive.

4. April 3: AG Barr issues second directive to BOP.  *See* Exhibit L, Delgado Motion, Docket No. 191-12. AG Barr emphasizes focus must be on those prison facilities which are experiencing the highest number of infections. FMC Fort Worth at that time ranked highest, though others had received more media attention. Recognizing the urgency, AG Barr orders immediate release for those most vulnerable according to CDC risk factors, and authorizes release to home confinement, *even if electronic monitoring is not available.*

5. April 3: Delgado returns to case manager Brown's office and gives to Mr. Brown the completed request attached to this Reply as Exhibit B. In Mr. Brown's office also is Mr. M. Gutierrez, the Unit Manager. Mr. Delgado expresses his desire for release to both men.

6. April 10:  Mr. Delgado has not received any response. The infections at FMC Fort Worth are increasing daily. Mr. Delgado sends an email to Case Manager Brown adding more information of Mr. Delgado's health concerns and the fact his situation meets the criteria of AG Barr's two directives.

7. April 11:  Mr. Delgado receives in the mail a written response to his written request. It is signed by Unit Manager Gutierrez, dated April 10, 2020. The response indicates:

> *"All inmates are being reviewed to determine [illegible] if they meet*
> *the guidelines for home confinement."*

8. April 13:  Mr. Delgado receives another copy of his written request from Unit Manager Gutierrez, but this one is dated April 6, 2020. *See* "REQUEST FOR ADMINISTRATIVE REMEDY - ATTEMPT AT INFORMAL RESOLUTION," Copy of Delgado Written Request, attached as Exhibit C to this Reply. This is an exact copy of Mr. Delgado's written request submitted on April 3rd, but it now has a different response from prison officials, and is dated April 6 (not April 10, as the other copy):

> *"All inmates are currently being reviewed for home confinement.*
> *You will be informed by the unit if you are eligible or not eligible for*
> *home confinement."*

This copy indicates at the bottom of the page that it was delivered to Mr. Delgado on April 13 by Counselor A. Cruz. There is no explanation given as to why there are differences between the two copies:

|  | **Exhibit B** | **Exhibit C** |
|---|---|---|
| Completed and turned in by Mr. Delgado | April 2 | April 2 |
| Different persons received Mr. Delgado's written request | *"Informal Resolution Submitted to "name of staff member):* [appears to be signed by someone whose last name begins with "G"] | *"Informal Resolution Submitted to "name of staff member):* [appears to have completely different handwriting, and signed by someone whose last name begins with "B"] |
| *"Date Received from Staff"* | April 10 | April 6 |
| Difference in textual response | *"All inmates are being reviewed to determine [illegible] if they meet the guidelines for home confinement."* | *"All inmates are currently being reviewed for home confinement. You will be informed by the unit if you are eligible or not eligible for home confinement."* |
| *"Responded"* | April 10 | April 6 |
| Date returned to Mr. Delgado | April 11 | April 13 |
| *"Delivered to Inmate"* notation on form | blank - - no entry | April 13 |

The administrative process at FMC Fort Worth appears to be struggling without definitive guidance from the Warden or BOP.

April 16:  Mr. Delgado requests a meeting with Case Manager Brown. Mr. Delgado observes that his request is on Mr. Brown's desk, and they discuss it. Mr. Brown states he submitted Mr. Delgado's name to officials higher in authority and that it was "looking good" because of Mr. Delgado's liver transplant issue and the fact that he poses a minimal chance for recidivism. Mr. Brown requests Mr. Delgado's home address where he would be released to and the name and contact information in

order to get more information. Mr. Delgado provides his wife's information. This procedure was implemented with all prisoners who appeared to qualify for release. Meanwhile, infections continue to rise at FMC Fort Worth.

April 20:   The Government asserts in its motion that "[a]ccording to BOP counsel, the defendant's request for home confinement was denied on April 20 and the defendant was informed of his decision." *See* Govt. Response, p. 7. Mr. Delgado did not receive notice on April 20 that a decision had been made (*see* May 5th entry, below).

April 23:  A bulletin is posted within FMC Fort Worth and all other prisons. *See* "Trump Administration Reverses Prisoner Coronavirus Release Policy, Advocates Say," Exhibit M of Delgado Motion, Docket 191-13. The Trump Administration changed levels of priority relative to release of prisoners due to the COVID-19 pandemic. Whereas before the highest priority was placed on the vulnerability of the prisoner due to health conditions, now it would be whether the prisoner has served 50% of his/her sentence (unless the prisoner has left 18 months or less to serve, in which case it requires the prisoner to have served 25% of his/her sentence). The initial AG Barr directives set forth a list of factors to be considered, none of which focused on the percentage of time served. On April 21, for no identifiable reason, the President's Administration's priority changed.

April 24: Twenty-three days have passed since Mr. Delgado submitted his written request; he has received no response from BOP, other than a posted bulletin notifying the general population of prisoners that the Administration's priorities have changed. Given the severity of the expected physical reaction his body will have if he

contracts the virus (to include severe illness and probable death), added to the rapid spread of the virus within this particular medical facility, Mr. Delgado pursues relief from the Court and decides to proceed with the filing of his motion.

April 27: Mr. Delgado's motion is filed.

April 28: The Court notifies the Government it should file its response no later than May 6.

April 29: Undersigned counsel urges the Government to file a response earlier than May 6, given the dramatic increase in the number of infected persons at FMC Fort Worth. DOJ Attorney Nothstein replies he is trying to reach Case Manager Brown. There is no indication in the Government's Response that Attorney Nothstein communicated with Case Manager Brown or other prison official who dealt with Mr. Delgado.

May 4:  Per the Government's Response filed on May 6, apparently some communication occurred between DOJ attorneys and "BOP Counsel" on May 4. *See* Govt. Response, p. 8, n. 2 ("It was only late on May 4 that the government was able to determine the status of the defendant's request for home confinement").  There is no indication in the Government's Response whether "BOP Counsel" is situated within the FMC Fort Worth prison facility, or whether this is a person situated in some other location and is a regional or national BOP counsel.

May 5:  Case Manager Brown calls Mr. Delgado into his office, and tells him:

> *"They shot you down. I really thought it looked good. They say you have not done enough of your sentence. You would need to do 30 months or 50% of your sentence to be eligible."*

Mr. Brown stated Mr. Delgado could appeal the decision but would need to fill out a different form. The discussion ended. May 5, not April 20 (as the Government contends), is the first indication Mr. Delgado received that his request was denied.

May 6:   The Government files its response in the instant case, arguing Mr. Delgado has not exhausted his administrative remedies; has not demonstrated that FMC Fort Worth cannot manage the COVID-19 situation; has not served enough time on his sentence; has not demonstrated extraordinary justification for release; FMC Fort Worth's home confinement policy is sufficient to address Mr. Delgado's risk factors and thus judicial intervention is unnecessary; and Mr. Delgado is "selfishly" "hiding behind" his medical condition in order to intentionally manipulate release.

### *2.  Exhaustion of Administrative Remedies.*

The Government argues Mr. Delgado failed to meet administrative requirements in the following respects:

1. He failed to request "compassionate release". Mr. Delgado's request for release to home confinement is not the same thing as a request for compassionate release.

2. He failed to submit a request directly to the Warden.

3. He failed to wait for the Warden's response. The law states the Warden has up to 30 days to respond to a request for compassionate release. The Warden does not decide whether to grant a modification of the sentence; he only recommends to the BOP whether to file a motion seeking modification. If the Warden fails to act in the 30-day time period, or if recommends that the request be rejected sooner than the 30-day deadline, the prisoner can then seek judicial relief. The Government argues

this Court has no jurisdiction because the 30-day period was not initiated, nor has it expired even if the Court deems it was initiated.

### a. The Distinction Made by the Government.

The Government's procedural argument rests on a distinction:  It argues there are requests for home confinement, and there are requests for "compassionate release." Without stating the authority upon which it rests, the Government submits that home confinement release is different from compassionate release. *See* Govt. Response, p. 9. It argues that although Mr. Delgado submitted to prison officials a written request for home confinement release, he did not submit a written request to the Warden for compassionate release. *Id.* The Government argues that a request for "compassionate release" is a request for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). *See* Govt Response, pp. 8 & 10. The Government's procedural argument is not that Mr. Delgado's motion should be denied with prejudice, but rather denied without prejudice because (a) he failed to request compassionate release through the warden, and (b) otherwise did not exhaust his administrative remedies (the Government suggests that once receiving a rejection from the warden, he must appeal the decision in order to exhaust his administrative remedies). *See* Govt. Response, pp. 1 & 7 ("BOP's records do not show that the defendant has initiated any appeal of BOP's decision").

To be clear, a request for "compassionate release" (that is, a request for a reduction of sentence) can never be decided by the Bureau of Prisons. The administrative process that the Government refers to merely offers the Bureau of Prisons the opportunity to file a motion for sentence reduction under Section 3582(c)(1)(A) (rather than the prisoner filing the

motion), which would then be decided by a federal district court. A prisoner may file his own motion to the Court **on the earlier of:**

> (a) the prisoner "fully exhaust[s] all administrative rights to appeal a failure of BOP to bring a motion on the defendant's behalf, **or,**
> (b) the lapse of 30 days from the warden's receipt of the prisoner's request.

18 U.S.C. § 3582(c)(1)(A).

Thus, once 30 days pass after the prisoner makes a request for sentence reduction, the prisoner can file a motion if BOP has not already filed a motion on his behalf. There is nothing in the statute nor in any directive given to Mr. Delgado or other prisoners that requires the prisoner's request has to be made to the "warden."

Mr. Delgado's written request given to prison officials included a request for release to home confinement. Clearly, this is a request for a modification of his sentence, as the Sentencing Guidelines plainly indicate that sentences of 60 months do not allow for home confinement - - they require imprisonment. Section 3582(c) of Title 18, United States Code, refers to a modification of a term of imprisonment. The Government posits that Mr. Delgado did not request a modification of his sentence in his written request to prison officials. Yet, it is clear that his motion before this Court does request such a modification under 18 U.S.C. § 3582(c)(1)(A)(i). *See* Delgado Motion, Docket No. 191, p. 1. The Government's procedural argument is that Mr. Delgado's instant motion should be dismissed to allow Mr. Delgado to submit a written request for sentence modification (assuming the written request he did submit to prison officials could not be construed as such a request), pursue all administrative rights to appeal, but in any event wait, at most, 30 days, and then re-file the very same motion that is now before the Court. We now stand 35 days from the day Mr. Delgado submitted a written request for release (April 3rd). If Mr. Delgado submits a different written request

today, styled "request for sentence modification" or "request for compassionate release", the Government presumably would state that Mr. Delgado would have met procedural requirements in filing a motion on June 8. Basically, the Government is arguing that Mr. Delgado should come back on June 8 with the same motion if he wants the Court to consider it.  If FMC Fort Worth has rejected Mr. Delgado's request for transfer to home confinement (indeed, not even a request for reduction of sentence), does anyone really think its position would be different on a request for sentence modification?  Meanwhile, the numbers of persons being infected is increasing. It has been reported that last week yet another prisoner within FMC Fort Worth tested positive.[1]

### b. Mr. Delgado's Administrative Request.

The Government's position ignores the practical effect of the critically dangerous situation that is actually is going on and dismisses the severity of the emergency nature of life in this particular prison facility. The COVID-19 pandemic has dramatically changed the course of how life is lived, including how prisons deal with medical issues. Because of the emergency health-related nature of the pandemic, the two directives by AG Barr were unprecedented in granting widespread authority to prison officials to release those prisoners who were particularly vulnerable to suffering severe consequences (to include

---

[1] Hundreds of inmates at Fort Worth Federal Prison Test Positive for COVID-19 (prison officials will not report how many prisoners have been tested).

http://www.wfaa.com/article/news/health/coronavirus/hundreds-of-inmates-at-fort-worth-federal-prison-test-positive-for-covid-19/287-28991576-e387-435b-a93c-0e514ecfaaac

death) as a result of a rapidly spreading virus. That is, the Executive Branch chose to take extraordinary steps to protect the most vulnerable. There was a continuous stream of reports from state and federal prisons that disclosed the unique vulnerability of those housed within, and in particular those who already were afflicted by medical conditions that were identified as severe risk factors. This environment of emergency carried over within the walls of the prisons, with prisoners reaching out to prison officials for direction. Yet, the same Executive Branch now urges the Judicial Branch, this Court, that it cannot do the same - - that it cannot evaluate the situation in the same fashion and cannot substantively consider whether an extraordinary response is necessary.

Upon release of AG Barr's memo and realizing his own particular health vulnerability in light of CDC's announced risk factors, Mr. Delgado asked prison officials how he could seek relief from the danger that lurked within. Their answer was singular in nature:  fill out this form and submit it.  The form is entitled "Request for Administrative Relief." He included on the form that he was seeking "administrative remedy." He was told verbally and then later in writing on the form that the request was being reviewed by prison officials to determine eligibility. He was also told that "there were no specific directives in place" at FMC Fort Worth facility to address Mr. Delgado's concern about being there given his CDC risk factors. Nothing was said regarding submission of a request for "compassionate release" versus release under home confinement. On the contrary, AG Barr's two memos focused on the compassionate response that was necessary to address the vulnerability of certain prisoners. Mr. Delgado pursued the route prison officials told him to pursue.  Mr. Delgado requested release from this prison facility based on the risk to his health. Upon arrival at BOP, he was provided a handbook:  <u>Federal Medical Center, Fort Worth, Texas, Admission and</u>

Orientation Handbook. Because of its size, it is not attached to this Reply. It is publicly accessible, however, at:

 https://www.bop.gov/locations/institutions/ftw/ftw_aohandbook_091018.pdf.

The handbook does not contain any instruction as to the procedure to be followed if one seeks home confinement versus "compassionate release" versus sentence modification. Prisoners are left to requesting guidance from their assigned counselors (who are there for that reason), and their case managers and unit managers. Yet, it was these same counselors and managers who told Mr. Delgado "there were no specific directives in place" at the facility. The Government cannot refute these facts, particularly where the guidance he received is noted on Mr. Delgado's written request and his manager signed the request indicating it was under review.

Even if we were to assume that Mr. Delgado did not submit the proper request and that his written request could not be construed as being a request for modification of his sentence, numerous courts have found that a court has the authority to waive the exhaustion/30-day requirement due to COVID-19's exigent circumstances. *See United States v. Perez,* 2020 U.S. Dist. LEXIS 57265 (S.D.N.Y. Apr. 1, 2020); *United States v. Zukerman,* 2020 U.S. Dist. LEXIS 59588 at *3 (S.D.N.Y. Apr. 3, 2020); *United States v. Colvin,* 2020 U.S. Dist. LEXIS 57962 at *2 (D. Conn. Apr. 2, 2020); *Miller v. United States,* 2020 U.S. Dist. LEXIS 62421 (E.D. Mich. Apr. 9, 2020); *Washington v. Barr,* 925 F.3d 109, 110 (2d Cir. 2019) ("exhaustion [of administrative remedy requirement] may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice"). As to those courts which have denied motions for compassionate release without prejudice, their reliance on the purposes for requiring initial administrative review are not applicable to this unique and life-threatening situation.

19

At least one court has indicated that not providing prison officials to first review a prisoner's request for compassionate release "would rob BOP of the opportunity to address [the prisoner's] request." *See United States v. Mathews,* 2020 U.S. Dist. LEXIS 65934 (E.D. Mich. Apr. 15, 2020). Mr. Delgado was informed, however, that his request was forwarded by his case manager and unit manager to the warden's office and was rejected solely on the basis that he had not served 50% of his sentence. That is, BOP **had** the opportunity to address his request, and rejected it; the purpose of pre-administrative review is not applicable. And given the basis of the prison's response to his request, there is no reason to believe that any additional administrative plea or procedure would result in any different result. It appears by all accounts that the 50% formulaic policy requirement which supersedes the compassionate health-related reasons expressed in AG Barr's two memos is now set in stone. As noted above, Case Manager Brown told Mr. Delgado he was rejected solely because he had not served 50% yet.

A different court reasoned that administrative exhaustion is appropriate because "the Bureau of Prisons' review can result in the request being resolved much more quickly and economically . . . than in litigation in federal court . . . [and i]t permits the Bureau of Prisons to gather the defendant's administrative and medical records, helping to produce a useful - and here, necessary - record for subsequent judicial consideration." *See United States v. Felix,* 2007 U.S. Dist. LEXIS 20249 (E.D. Mich. Apr. 2, 2020). In Mr. Delgado's situation, however, BOP took weeks to address Mr. Delgado's request before rejecting it for a reason that has nothing to do with his medical situation and CDC risk factors. Stated differently, the hypothetical, and laudable, justifications for allowing BOP to first review administrative requests may be appropriate under normal circumstances, but the extraordinary and rapidly

developing situation brought about by COVID-19 has turned a blind eye to previously stated justifications for administrative exhaustion. *See, e.g., United States v. Atwi,* 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 2, 2020).

Moreover, the law offers inmates an emergency procedure where, "If the request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." *See* 28 C.F.R. § 542.18. Mr. Delgado's administrative request went up the chain and came back down stamped rejected. He has substantively satisfied his administrative requirement. For the Government to insist that he must now submit a different written request styled "compassionate release" rather than "transfer to home confinement" as before is to rest solely on form over substance, a hyper-technical formulaic argument that collides with the unfortunate, critically dangerous situation that Mr. Delgado faces.

The Supreme Court has held that an administrative-exhaustion requirement in the context of prisoner requests "hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies but need not exhaust unavailable ones." *See Ross v. Blake,* __ U.S. __, 136 S. Ct. 1850, 1858 (2016). The Court explained: "As we explained in *Booth,* the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.,* citing *Booth v. Churner,* 532 U.S. 731, 737-738 (2001). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859. "[C]ourts in this and other cases must apply it to the real-world workings of prison grievance systems." *Id.* Justice Kagan, joined by Chief Justice Roberts and Justices Kennedy, Ginsburg, Alito, Sotomayor, Thomas and Breyer, observed that there are

21

at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* Justice Breyer's joined Justice Kagan's opinion, but added that there are "well-established" exceptions to exhaustion." *Id.* at 1862-1863, Breyer, J., concurring, citing *Woodford v. Ngo,* 548 U.S. 81, 103 (2006); *Sims v. Apfel,* 530 U.S. 103, 115 (2000) (Breyer, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) **(_constitutional claims_);** *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) **(_futility_);** *McKart v. United States,* 395 185, 197-201 (1969) **(_hardship_);** *McCarthy v. Madigan,* 503 U.S. 140, 147-48 (1992) **(_inadequate or unavailable administrative remedies_);** II R. Pierce, Administrative Law Treatise § 15 94th ed. 2002). The Justices also noted that "When the facts on the ground demonstrate that no such potential [for administrative remedy] exists, the inmate has no obligation to exhaust the remedy." *Ross v. Blake,* 136 S.Ct. at 1859.

Applying this principle to the instant case, Mr. Delgado has been told in several ways that his request is denied because he has not served 50% of his sentence. His plea based on the unique circumstances of his health vis-a-vis this virus and environment has fallen upon deaf ears. As a result, is there any real or practical expectation that any different result is possible by changing the words on the form from "transfer to home detention" to "compassionate release", particularly where FMC Fort Worth prison officials have made clear that Attorney General Barr's directive to identify which prisoners are vulnerable enough to provide compassionate release is now reduced to a formulaic 50% requirement, the same reason given to Mr. Delgado by his case manager for the prison's rejection of his request? As all of the Supreme Court Justices expressed, "the facts on the ground demonstrate that no potential [for relief] exists" via an administrative request to the FMC

Fort Worth Warden. This reality coupled with the urgency of the situation eliminates the Government's hyper technical suggestion that he re-submit another request to the Warden for "compassionate release." *See Ross v. Blake,* 136 S.Ct. at 1859.  Literally, each day brings the very real potential that Mr. Delgado could contract the virus in this facility where already approximately one-third of its prisoners have been infected.

### C. Government Argues:  "No Extraordinary and Compelling Reasons"

The Government argues that Mr. Delgado does not present "extraordinary and compelling reasons" to warrant a reduction of sentence, as he does not meet any of the policy reasons set forth in Section 1B1.13 of the Sentencing Guidelines. This section, however, is not binding upon this Court. *See United States v. Cantu,* 423 F. Supp. 3d 345, 352 (S.D. Tex. June 17, 2019). In *Cantu,* Judge Garcia Marmolejo observes that the language of Section 1B1.13 "clearly contradicts" the language of 18 U.S.C. § 3582(c)(1)(A), as revised under the First Step Act. *Id.* at 348-352. The Court held that 18 U.S.C. § 3582(c)(1)(A) does not define or place any limits on what "extraordinary and compelling reasons" might warrant a reduction. *Id.* at 352, quoting *Crowe v. United States,* 430 F. App'x 484, 485 (6th Cir. 2011). Moreover, the plain language of Section 1B1.13 does not indicate that the reasons listed are exclusive. As with other guidelines, Application Note 1 indicates that the listed reasons meet the definition of "extraordinary and compelling." *See* U.S.S.G. § 1B1.13, n.1 ("extraordinary and compelling reasons exist under the any of the circumstances set forth below"), but do not indicate the list is exclusive. Section 3582(c) of Title 18, United States Code indicates that a modification is warranted if the Court, after considering the factors in Section 3553(a), finds that extraordinary and compelling reasons warrant a reduction. The Court's decision need only be "consistent" with applicable policy statements.

Mr. Delgado has provided this Court with compelling information relative to his health situation, his affliction with 6 of the 9 risk factors for severe COVID-19 consequences, the inability of FMC Fort Worth to contain the COVID-19 outbreak, the stark numbers of prisoners being infected and dying, an example of the rapid decline to death of a prisoner at that facility, and the living procedures at FMC Fort Worth (i.e., the methodology of mail retrieval, meal distribution, laundry exchange, computer and phone usage, and other living conditions) which still lend themselves to infection. The Supreme Court has held that a prison has a duty to provide adequate medical care for its prisoners and to protect them, as this falls within the Eighth Amendment's proscription against cruel and unusual punishment. *See, e.g., Estelle v. Gamble,* 429 U.S. 97 (1976). To this end, the Supreme Court recognized that the words of the Eighth Amendment are not precise, and their scope is not static. *See Trop v. Dulles,* 356 U.S. 86, 100-101 (1958). They must draw their meaning from "evolving standards of decency that mark the progress of a maturing society." *Id.* This concept of "evolving standards of decency" first observed in 1958 was incorporated into the Court's decision in 1976. *See Georgia v. Public.resource.org, Inc.,* 2020 U.S. LEXIS 2529 at *48, n.10 (U.S. Apr. 27, 2020). The Eighth Amendment's proscription against cruel and unusual punishment includes "unnecessary suffering." *See Bucklew v. Precythe,* ___ U.S. ___, 139 S. Ct. 1112, 1144 (2018), Breyer, J., dissenting, joined by Ginsburg, Sotomayor & Kagan, JJ. As noted by Justice Breyer, "[t]he question is not, as Justice Thomas maintains, whether a punishment is deliberately inflicted to cause unnecessary pain, but rather whether we would today consider the punishment to cause excessive suffering." *Id.* Mr. Delgado faces the very real prospect of suffering severe consequences that are plainly unnecessary.

24

Again, Mr. Delgado is not seeking to establish that FMC Fort Worth or any of its officials have committed misconduct. Rather, he has established that his punishment of imprisonment, given his medical condition, CDC risk factors and the circumstances at this particular medical facility effectively have resulted in an intolerable risk of excessive and unnecessary suffering and a real potential for death. While he not served the length of time initially contemplated by this Court, what must be balanced is whether the purposes of sentencing will be accomplished in this critically dangerous environment given his afflictions. Under current release procedures implemented by the BOP in light of recent changes in the law, there is every reason to believe that Mr. Delgado would not be incarcerated for 60 months. If the pandemic had not arrived, there would likely be a drastic reduction of the amount of time he actually would spend in prison (likely a two-year reduction). Nevertheless, a myopic focus on the amount of time he has been in this medical facility with consideration of the factors described above is to ignore the fact that our law must provide for extraordinary circumstances. Indeed, we must leave room for evolving standards of decency in the administration of our laws.

Yet the Government was not content with making legal arguments. Instead, the Government proposes in its Response that there exists a criminal, subversive intent by Mr. Delgado to "hide behind" his serious medical conditions in order to escape punishment. *See* Govt. Response, pp. 20-21 *("[h]is age and medical conditions never got in the way of him committing his crimes, and they should not be something he can hide behind now to avoid the consequences of his actions").* The Government's suggestion of bad intent in the filing of this motion, given Mr. Delgado's affliction of 6 of 9 risk factors in the midst of an unexpected pandemic within a medical facility that clearly cannot manage the crisis, is shocking and

evidences the myopic dismissal of undisputed facts relative to intolerable levels of risk. Undersigned counsel is perplexed at even how to respond to the suggestion stooped to by Government counsel. But, as one scholar has properly placed the issue, "when they go low, we go high."

The circumstances of this situation are beyond an adequate description. This is a real situation, where an unprecedented and wholly unexpected unusual situation exists, and people confined with each other are at an extreme risk of getting sick and dying. An environment where approximately one-third of prisoners have been infected and there still does not exist an effective methodology of testing nor distancing. The tents the facility built are not to protect the uninfected; they were built for the infected, *after* their symptoms are discovered. Others inside the main facility are carrying the virus, as obvious from persons demonstrating symptoms and being tested positive in the last two weeks.

Again, it is not so much an issue of whether Mr. Delgado will contract the virus, but rather the probable devastating consequence that will fall upon him given the number of CDC risk factors and the inability of the prison to adequately treat the infection once contracted. Mr. Delgado seeks relief from this Court because FMC Fort Worth has confirmed it will not. He is not seeking freedom, but rather a modification of his sentence which could include home confinement for any time period this Court deems appropriate and other conditions, to include continuation of participation in programs to address his alcohol dependency.

Respectfully submitted,

By:    */s/ Michael McCrum*
Michael McCrum
MCCRUM LAW OFFICE
404 E. Ramsey, Suite 102
San Antonio, TX 78216
Telephone:  (210) 225-2285

26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2020, I electronically filed the foregoing with the

Clerk of Court using the ECF system, which sent notification of such filing to all counsel of

record.

By:     */s/ Michael McCrum*
          Michael McCrum